[Crim. No. 411.  First Appellate District.—May 9, 1913.]

THE PEOPLE, Respondent, v. JAMES R. GREEN, Appellant.

CRIMINAL LAW—FALSE PRETENSES—TIME TO WHICH REPRESENTATIONS REFER.—To constitute a false pretense, the misrepresentation must be of an existing or past fact; it cannot relate to the future, or be a mere promise to pay. This rule is here applied where representations were made by the accused to a poultry association that eggs supplied by it were to be "processed" and stored, whereas they were sold each day as received.

ID.—PROMISE TO OBTAIN BOND TO PROTECT CUSTOMERS.—A promise in such case by the accused to furnish a bond to protect the poultrymen against loss, followed by negotiations with a surety company to obtain the bond, relates to an event to happen in the future, and will not sustain a charge of false pretenses.

ID.—AGENCY—FALSE PRETENSES BY OR TO AGENT.—While false pretenses may be made to an agent of the person defrauded, yet, when made by an agent, they must be directly authorized or consented to in order to hold the principal, for authority to do a criminal act will not be presumed.

ID.—CRIMINAL LIABILITY OF PRINCIPAL FOR ACTS OF AGENT.—The civil doctrine that a principal is bound by the acts of his agent within the scope of the agent's authority has no application to criminal law. If a principal is liable at all criminally for the acts of another, such liability must be founded upon authorized acts.

ID.—SIGHT DRAFT—OBTAINING GOODS BY DRAWING.—A sight draft drawn by a person on himself, in payment of goods received, though carrying the implied representation of ability to pay the sum therein named on presentation, is a representation as to future ability and will not sustain a charge of making false pretenses.

APPEAL from a judgment of the Superior Court of Santa Cruz County and from an order refusing a new trial. Lucas F. Smith, Judge.

The facts are stated in the opinion of the court.

T. S. Minot, A. A. Moore, and Stanley Moore, for Appellant.

U. S. Webb, Attorney-General, Benj. K. Knight, District Attorney, and J. H. Riordan, for Respondent.

KERRIGAN, J.—The defendant was indicted, tried and convicted of the crime of obtaining money by false pretenses, and sentenced to serve a term of seven years in the state prison. This is an appeal from the judgment and from an order denying defendant's motion for a new trial.

The indictment and conviction were had under section 532 of the Penal Code, defining the offense of obtaining the property of another by false pretenses, and providing for the punishment thereof.

For a clear understanding of the case a narrative of the transactions leading up to the commission of the alleged offense is necessary.

One Victor H. Clairmont invented an egg-preserving process whereby it was claimed that eggs might be preserved for an indefinite period. About March 1, 1911, he successfully demonstrated his patent in Santa Cruz to the poultrymen in that vicinity. He then left that place, but returned again on January 27th of the following year as the representative of Green, Foster & Lehmann, a copartnership doing business in San Francisco in eggs and other produce. The defendant was a member of said firm. On the return of Clairmont to Santa Cruz in January, 1912, Green accompanied him, and there met and talked with many of the members of the Santa Cruz Poultry Association. David C. Berry, the party who is claimed to have been defrauded, was a member of this association. As a result of this meeting an "egg exchange" was established in Santa Cruz by Green, Foster & Lehmann, with Clairmont temporarily in charge thereof. After a few days Clairmont was succeeded by George Damkroeger as the local representative of the firm, and Clairmont returned to San Francisco, but continued in the employ of the partnership. Arrangements were completed between Green and the poultrymen's association whereby the exchange received the eggs

from the producers, and a tag, setting forth the number of cases of eggs delivered and the date of delivery, was given to the poultrymen. The tag was executed in triplicate, one being given to the producer, one forwarded to the firm in San Francisco and the third retained at the exchange. Upon receipt of this tag by the firm in San Francisco an instrument, referred to in the case as a "sight draft," was mailed to the poultryman for the amount shown to be due on the tag. This sight draft, drawn by the firm upon itself and in favor of the poultryman was then usually cashed by him at one of the Santa Cruz banks, which thereafter presented it to Green, Foster & Lehmann for payment. This practice continued until about April 10, 1912. On or about that date the Santa Cruz banks refused to cash any more of these drafts for the reason that some previously cashed had been dishonored. Thereupon one McIsaacs, who was interested in the success of the poultry association, went to San Francisco to ascertain the difficulty. He met Green, and discussed the matter with him and Clairmont. In explanation of the default in payment of the drafts Green told McIsaacs that the trouble was caused by his banks over a lease, and assured him that everything would be all right in the future; but McIsaacs informed Green that the poultry raisers of Santa Cruz would have to be satisfied or no more eggs would be delivered. Green then informed McIsaacs that the firm would immediately put up an indemnifying bond for two thousand dollars to protect the poultrymen against loss. The bond was also to cover back drafts. McIsaacs then informed Green that he would return to Santa Cruz, call a meeting of the puoltrymen's association the next day, and asked that Green be present personally at the meeting to explain the situation. Green being busy Clairmont went to Santa Cruz as his representative, and at the meeting called by McIsaacs detailed everything that Green had told him. In his statement he asserted that the firm of Green, Foster & Lehmann was solvent, explained the trouble it had had with the bank, the cause of the nonpayment of the drafts, and communicated the promise to give the bond. Being thus assured the poultrymen's association, including Berry the prosecuting witness, recommenced delivering eggs to the "exchange." Shortly thereafter on April 22, 1912, the firm went into the hands of a receiver through the action of

Lehmann, one of its members, demanding an accounting. A draft in the amount of $51.90 in favor of said Berry, theretofore issued in the manner above described, was presented for payment and not paid, with the result of this prosecution of Green for obtaining the goods, to wit, eggs, of Berry by false pretenses. There is testimony to show that but for this action upon the part of Lehmann the draft would have been paid.

There are a number of fraudulent representations alleged in the indictment to have been made, to wit:

(1) That the firm of Green, Foster & Lehmann was solvent;

(2) That said firm was able to pay for all property it purchased;

(3) That Berry would be paid by a sight draft;

(4) That said sight draft upon presentation was a good and sufficient order for the payment of money;

(5) That said firm was able to pay said draft;

(6) That an indemnifying bond for two thousand dollars would be given; and

(7) That said bond had actually been executed.

The points relied upon for a reversal are: insufficiency of the evidence to sustain the verdict; errors in the admission and rejection of evidence and errors in giving and refusing instructions.

As before stated, the indictment and conviction were had under section 532 of the Penal Code, defining the crime of obtaining money or goods under false pretenses.

Statutes of this character have been the subject of judicial construction throughout this country in a great many cases; and the decisions of the courts of last resort are in accord to the effect that in order to constitute a false pretense in law the misrepresentation must be of an existing or past fact, and cannot relate to the future, or be a mere promise to pay. (*People* v. *Jordan,* 66 Cal. 10, [56 Am. Rep. 73, 4 Pac. 773]; *People* v. *Wasservogle,* 77 Cal. 173, 174, [19 Pac. 270]; 2 Wharton on Criminal Law, 11th ed., sec. 1437; 19 Cyc. 394, 395.)

Judged by this standard do the facts in this case bring the defendant within the operation of the statute?

The prosecution urges that certain false representations were made prior to the meeting of April 13th. Thus the at-

torney-general claims that when the defendant first instituted the "egg exchange" he represented that all eggs were to be "processed" and stored, thereby creating the mistaken belief that the eggs could be recovered in the event of the firm's failure to pay therefor; whereas in fact the eggs were sold each day as received in San Francisco. In answer to this claim it is sufficient to point out, first that such representation manifestly related to an act to be performed in the future; and, secondly, that by the subsequent arrangement of the parties the eggs were to be paid for in the manner heretofore stated, and no reliance was placed by the members of the association upon the *inference* that the "processed" eggs could be recovered if not paid for.

It is further claimed that a certain letter written by the defendant to Clairmont some time in February or March, 1912, and exhibited by Clairmont to one Hynes, and by Hynes communicated to Berry, is the subject of a false pretense.

That letter spoke of procuring certain funds to pay for eggs. The letter was a private communication from the defendant to Clairmont, written at a time prior to any question as to the firm's insolvency. It does not appear that it was the intention that this letter should be exhibited to any one, and Berry certainly placed no reliance upon its contents—at least if we may judge by his testimony, for he testified that the sole inducement that caused him to part with his eggs was the promise that a bond would be furnished.

In addition to this, one Mrs. Damkroeger testified to a conversation with the defendant concerning his firm's solvency, but she was unable to fix the date more definitely than that it was some time after January, 1912; and she was not positive that she ever communicated this conversation to the prosecuting witness.

These in brief constitute the representations occurring prior to the meeting of April 13th and relied upon by the prosecution as constituting false pretenses. For the reasons indicated it is manifest that these statements could not form the basis of a prosecution for obtaining property by false pretenses.

The only other statements testified to which might form such basis were those made at the meeting of the Poultrymen's Association on April 13, 1912, when Clairmont and McIsaacs represented to the members that the firm of Green,

22 Cal. App.—4

Foster & Lehmann was solvent, and that a bond would be given by the partnership to insure payment of the eggs. At this meeting the only authorized representation was that the firm would give a bond.

The evidence in relation to the representation of the solvency of the firm is as follows: Clairmont testified that he was authorized by Green to say that a bond would be furnished; but that he was not authorized by Green or any one else to make any statement as to the solvency of the firm; and that what he stated at the meeting of April 13th as to the firm's solvency was his individual opinion.

McIsaacs testified that on the occasion of his visit to San Francisco to investigate the cause of the failure of Green, Foster & Lehmann to pay the drafts, the defendant represented to him that the firm was solvent. The evidence, however, fails to show that McIsaacs had any authority from the defendant to make any statement as to the firm's solvency, or that McIsaacs made this visit to San Francisco as the representative of the poultry association, or of the prosecuting witness; but, on the contrary, it appears that he went on his own behalf, the inducement being the personal interest he had in the egg exchange and in promoting the egg industry in Santa Cruz.

Beyond the negotiations leading up to the formation of the "egg exchange" on the occasion of the defendant's visit to Santa Cruz in January, no statements were made by him personally. What statements were made were through his agents. So far as the evidence shows, the defendant was never in Santa Cruz concerning the egg business except on that occasion, and he never had any personal communication with Berry. Before one can be convicted of a crime by reason of the acts of his agent a clear case must be shown. The civil doctrine that a principal is bound by the acts of his agent within the scope of the agent's authority has no application to criminal law. (1 McLain on Criminal Law, sec. 188.) While false pretenses may be made to an agent of the person defrauded, yet when made by an agent they must be directly authorized or consented to in order to hold the principal, for authority to do a criminal act will not be presumed. (1 McLain on Criminal Law, sec. 683.)

If a principal is liable at all criminally for the acts of another such liability must be founded, as just stated, upon authorized acts. There is no evidence in this case that defendant authorized any person to make statements relative to the solvency of Green, Foster & Lehmann.

As to the question of the promise, made April 13th, to furnish a bond being the subject of a false pretense, assuming, for the sake of argument, that the eggs were furnished after that date and on the strength of the promise to furnish the bond—the one pretense which the prosecuting witness testified induced him to deliver the eggs—the fact still remains that what Clairmont said as to furnishing the bond related to an event to happen in the future. But, as before stated, the false pretense mentioned in the statute must be of a fact existing or past; and a representation concerning a future event, though the event fail to happen, will not support a charge of obtaining money by false pretenses. Moreover the evidence negatives the theory that the defendant never intended to keep the promise, and shows that the defendant did enter into negotiations with a surety company for a bond, but the matter was not concluded when the firm went into the hands of a receiver.

Considerable argument is indulged in by counsel as to what deliveries were covered by the draft for $51.90, and whether such deliveries were made before or after the meeting of April 13th. The amount of the draft does not correspond with any of the deliveries made subsequently to April 13th except that of the 22d; and it could not have referred to this delivery (which by an odd coincidence amounted in value to the sum due for the deliveries of April 4th and 8th) for it was drawn before that delivery was made. Furthermore Berry testified that he never received a draft for the delivery of the 22d, or for any of the deliveries after the 13th, and in fact none was ever issued. While on his direct examination Berry testified that the draft was given for deliveries made after the 13th, on cross-examination, and after consulting his books, he was compelled to admit that the draft was given for the deliveries of the 4th and 8th of April. In this admission he is corroborated by the secretary of Green, Foster & Lehmann, who signed the draft. The evidence establishes, therefore, beyond all question of doubt

that the draft for $51.90 covered the deliveries of April 4th and 8th, a time before the alleged pretenses of solvency or furnishing a bond were made, and it follows that those deliveries were not made upon those promises.

Defendant also complains of the admission by the court of hearsay evidence; but as the case must be reversed upon the ground of the insufficiency of the evidence to support the charge, a discussion of the admission of such incompetent evidence is not necessary.

The instructions of the court assigned as error by the defendant refer principally to the effect of pretenses relating to future events, and the law in that regard has already been sufficiently discussed.

Respondent, referring to the sight drafts given by Green, Foster & Lehmann in payment of the goods obtained, requests that the character of these so-called sight drafts be determined.

The instrument as set out in the indictment is in the following form:

"San Francisco, Cal. April 17, 1912.

"GREEN, FOSTER & LEHMANN,

"Creameries: Lakeside, Oregon.

"Bandon, Oregon.

"Main office: San Francisco.

"At sight at our San Francisco office, we will pay to the order of D. C. Berry, $51.90.   Fifty-one 90/100 dollars.

"GREEN, FOSTER & LEHMANN,

"By D. P. Eger, Secretary.

"To GREEN, FOSTER & LEHMANN, Clay & Front streets, San Francisco, Cal."

It is, we think, apparent that this instrument purports to be nothing more than an order drawn by Green, Foster & Lehmann upon themselves, for the payment of money, and cannot by any process of reasoning whatever constitute anything more than a promise by the maker to pay the sum therein named upon presentation.   True it carries with it the implied representation of the ability of the drawer to do so, but what does that implied representation amount to.   It amounts to a representation of future ability, for clearly some time was to elapse between the issuing of the draft and its presentation and payment, and thus comes within the class of representations as to future events which will

not, according to the authorities, sustain a charge of the making of false pretenses.

It is urged that the prosecuting witness parted with his property on the strength of the issuance to him of this sight draft. If so, he parted with it upon the strength of a promise to pay; in which respect the transaction does not differ from the ordinary sale of goods on credit, and the issuing of the drafts, as shown by all the circumstances of the case, was an arrangement adopted for the payment of the goods as purchased.

The case of *People* v. *Wasservogle,* 77 Cal. 173, [19 Pac. 270], is not at variance with the views here expressed. In that case the passing of the draft was accompanied by the statement that the drawer had funds in the hands of the drawee with which it would be paid. The conviction was upheld upon this statement, which amounted to a representation of an existing fact. The court, however, expressly recognized the rule that a pretense must be of a past or existing fact.

While it is unfortunate that the members of the poultry association should fail to receive the price of their products, it must be remembered that the defendant cannot be punished unless his acts bring him within the scope and intent of the statute under which he was prosecuted.

The judgment and order denying a new trial are reversed.

Chipman, J., *pro tem.,* and Lennon, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 7, 1913.