[Crim. No. 802.   Third Appellate District.—January 29, 1925.]

THE PEOPLE, Respondent, v. R. D. MACE, Appellant.

[1] CRIMINAL LAW — OBTAINING MONEY BY FALSE PRETENSES — CORROBORATIVE CIRCUMSTANCES.—In a prosecution for obtaining money by false pretenses, the circumstances connected with the transaction, the entire conduct of the defendant, and his declarations to other persons are proper matters for consideration of the jury, and may be looked to to furnish the corroborative evidence contemplated by the law.

[2] ID.—CONFIDENTIAL INTERVIEW—DUTY TO DISCLOSE FACTS.—Where the defendant in such prosecution, in soliciting the funds from the complaining witness, put the interview upon a confidential

---

1.   See 12 **Cal. Jur.** 475.

2.   Obtaining loan as constituting crime of obtaining money by false pretenses, note, **Ann. Cas.** 1916C, 1158. See, also, 11 **R. C. L.** 848.

basis, common honesty and fair dealing required, and the complaining witness was justified in assuming that defendant would make a full disclosure of his financial condition and, when defendant made a list of his debts, such statement implied that he did not owe other debts.

[3] ID.—REPRESENTATIONS AS TO AMOUNT OF INDEBTEDNESS—BELIEF OF COMPLAINING WITNESS—PUBLIC RECORD—KNOWLEDGE.—In this prosecution for obtaining money by false pretenses, predicated upon the act of defendant in obtaining a loan from the complaining witnesses by misrepresenting the amount of his indebtedness, it was not necessary to sustain the charge that defendant should have expressly stated that he was solvent or that a stated sum would pay his debts, if all of his statements together reasonably created a belief to that effect; and the fact that the indebtedness upon defendant's home, in an amount greatly in excess of the indebtedness stated by defendant, was of public record did not charge the complaining witness with knowledge thereof or of its amount.

[4] ID. — MISSTATEMENTS AS TO USE OF MONEYS—FALSE PROMISES—FRAUDULENT INTENT.—In such prosecution for obtaining money by false pretenses, while the defendant's false statement that he needed the money to finish making payments on the purchase price of an X-ray machine and his false promise that he would use the money to make such payments and then give the complaining witness a mortgage upon it and other property, coupled with his subsequent acts of mortgaging the X-ray machine to secure money from another person and increasing the existing indebtedness upon the other property, are not of themselves sufficient to sustain the charge, they tend strongly to establish the fraudulent intent necessary to constitute the crime.

[5] ID.—LIST OF DEBTS — FALSE TOKEN. — In such prosecution, the written list of defendant's debts, used upon the application for the loan, was not a false token.

(1) 25 **C. J.**, p. 646, n. 9.   (2) 25 **C. J.**, p. 596, n. 41.   (3) 25 **C. J.**, p. 596, n. 41, p. 597, n. 83.   (4) 25 **C. J.**, p. 648, n. 28. (5) 25 **C. J.**, p. 613, n. 60.

APPEAL from a judgment of the Superior Court of Mendocino County and from an order denying a new trial. Ross Campbell, Judge Presiding.   Affirmed.

The facts are stated in the opinion of the court.

3.  Necessity of ascertaining truth of representations which are basis of prosecution for false pretenses, note, 7 Ann. Cas. 34.
    5.  See 12 Cal. Jur. 474.

W. D. L. Held for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

FINCH, P. J.—The defendant was convicted of the crime of obtaining money by false pretenses. This appeal is from the judgment and the order denying his motion for a new trial.

The false pretenses alleged in the indictment are that the defendant "did . . . pretend and represent to the said H. L. Preston that he, the said R. D. Mace, wanted to borrow from him, the said H. L. Preston, the sum of twelve hundred dollars, for the purpose of making a final payment upon a certain X-ray machine, and certain medical and surgical instruments, then and there in the possession of him, the said R. D. Mace; that he, the said R. D. Mace, was solvent; that his liabilities did not exceed the sum of two thousand dollars; that it was his present intention, and that he would, upon receiving the said sum of twelve hundred dollars from the said H. L. Preston, as aforesaid, make final payment upon said X-ray machine and certain medical and surgical instruments aforesaid, and secure title thereto, and that upon receiving title thereto he would immediately make and execute a chattel mortgage upon said X-ray machine and said medical and surgical instruments aforesaid to him, the said H. L. Preston, as security for said loan of said sum of twelve hundred dollars."

The grounds urged for a reversal are, first, "that so much of the representation as is in the nature of a promise is, standing alone, insufficient to warrant a conviction"; second, that the evidence is insufficient to show that the defendant made any of the alleged representations of facts; and third, that the testimony of the prosecuting witness that such representations were made is entirely uncorroborated. The first contention need not be further noticed than to state that the trial court correctly instructed the jury that the alleged false promise was not such a false pretense as would warrant a conviction.

The prosecuting witness is judge of the superior court of Mendocino County. The defendant is a physician and sur-

geon and, at the time of the trial, was of the age of thirty-five years. He located in Ukiah in 1921 and practiced medicine there until March, 1923. Whether he continued thereafter to practice at that place does not appear and is immaterial. He resided in the state of Colorado for two years prior to coming to California. At the time of the alleged false representations the defendant owed debts contracted while in Colorado in the sum of more than $1,000 and a total indebtedness of about $16,000. He testified that the amount thereof was about $14,000. Preston is the only witness who gave direct testimony that any of the alleged false pretenses were made by the defendant. He testified positively that the defendant stated that he owed but $2,000. Appellant contends that later in his testimony the witness so qualified such positive statement as to destroy the force thereof and that, considering the testimony of the witness as a whole, it does not appear therefrom that any alleged false statement of fact was made by the defendant. In order to determine the question thus presented it is necessary to quote extensively from Preston's testimony, maintaining the sequence in which his various statements were made at the trial, even though doing so requires repetition. He testified as follows:

''Q. . . . It is alleged in the indictment that he (defendant) secured the sum of two hundred dollars in money and a thousand dollar liberty bond on or about the first day of December, 1923, from you under certain alleged misrepresentations. Tell . . . the facts and circumstances attending that matter. A. Well, about the first of November, 1923, or the latter part of October, 1923, Doctor Mace, the defendant, came to my chambers in the courthouse here in Ukiah and wanted to borrow two thousand dollars, and when he came in he asked me if he could close the door, that he wanted to talk to me about a private matter and didn't want anybody to hear it, or know anything about it, . . . and he sat down and we talked quite awhile over his financial condition, and he stated to me he was buying, or rather paying for an X-ray outfit and some surgical and medical instruments in San Francisco, and that he lacked sufficient money to make the payments and if I would loan him two thousand dollars, why that would put him on his feet and he would go down to San Francisco and pay off

the balance of the indebtedness on his X-ray outfit and other medical and surgical instruments, the technical names of them I don't remember, and then come back and give me a mortgage on them. . . . I didn't have that much money on hand and I said, 'I am expecting some money in about the first of December, could you wait thirty days, until the first of the month,' and he said yes, that he could stand them off until that time; and either that same day or the next day, I gave him a check for two hundred dollars to make the urgent payments that were to be made on the outfit, so I understood, and then he was to hold them off for thirty days with the assurance that he would have the balance of the money for them the first of December. . . . I didn't see him any more until about the first of December, when he came back after the balance of the money and we had another talk and I told him, 'Doctor, I haven't gotten in the money I expected and it is pretty hard for me to give you the balance of that two thousand dollars, . . . could you get along on less?' And he said yes. I says, 'how about another thousand, would that fix you up?' And he says yes, that would be fine, that his collections had been better and that he could make it on a thousand dollars, be all he needed. So I didn't have the thousand dollars in money, so I went to my safe and got a thousand dollar liberty bond and I gave him that. . . . I gave him back the note I had taken previously for the two hundred dollars and took his note for twelve hundred dollars, . . . but I am getting a little ahead of my story. I says it may take two or three days to send this bond through the bank to the city and it may not bring a thousand dollars, it had some coupons on it, and I says, 'I will cash it and get you the money on it,' and he says, 'no, I will take the bond, the bond is as good as money to me,' and he insisted that I give him the bond, and I gave him the bond and I says, 'When you find out the value of that bond come back and I will credit it on the back of this note,' and he said he would. And then he said he would go down to the city at the first conversation and also the last conversation . . . and finish the payments on his X-ray outfit and other lamps and one thing another and come back and give me a mortgage. . . . Q. On the first occasion . . . did you and he talk over his financial condition? A. Yes, quite thoroughly I thought. Q. What did he say his financial

condition was at that time? A. Well, he told me that two thousand dollars would put him on his feet, that would pay up his indebtedness and he would be able then, out of his practice and income from his practice, to save a hundred dollars a month and that would go towards payment of my indebtedness. Q. Did he tell you or show you a list of his liabilities, what he owed? A. Yes, he had a piece of paper, . . . I don't know whether I had it in my hands or not, I thought I had it but I don't find it, but he had a paper there with the figures and what he owed and he made some figures on it while we were talking. Q. Did he mention the name of any people he owed? A. Yes, mentioned the name of O'Connor Furniture Company in Santa Rosa, and Floyd Banker, the automobile man, and these people in San Francisco, the Victor X-Ray Machines, or Victor X-Ray Company, I don't remember which it was. Q. And he represented to you, did he, that the sum of two thousand dollars would put him on his feet? A. So he said. Q. That was what his representations were? A. That's what he owed as I understood it. . . . He told me also, 'I can get this money from Mr. Albertson, but I don't want anybody to know I have to borrow money and I have been doctoring Mr. Albertson and hated to go there and . . . I hesitated to come to you but I thought I could trust you.' . . . He said he could get it through Mr. Albertson or from him. . . . Never saw him any more until after he filed his petition in bankruptcy. I may have seen him around town or in court on some matter but never to talk to. . . . I believed that two thousand dollars would put him on his feet. . . . Q. And you relied upon those statements? A. I did. Q. And otherwise would you have given him the money or liberty bond? A. I would not. . . . Q. And you relied in part upon the representation that it was his intention to execute the mortgage? A. Yes, sure. Q. And you relied in part that it was on the representation that he owed two thousand dollars and no more? A. Certainly. . . . He told me if he got the two thousand dollars that would put him on his feet and he could pay these people and give me a mortgage and out of his earnings, over and above his living, he could save a hundred dollars a month and that would go to me until the note was paid.''

Cross-examination: "Q. And he (defendant) had in his hand a paper showing a list of certain creditors you say? A. Yes, and the amounts he owed. . . . Q. Did he say anything to you about owing upon his house over here? A. I think that was mentioned. Q. You knew he owed nine thousand dollars on his house? . . . A. I did not. . . . Q. And that the public records of this county showed he owed nine thousand dollars on his house? A. I didn't know anything of the kind until your schedule in bankruptcy. I didn't examine the records. . . . Q. You knew, however, that he did owe something on his house? A. I supposed he did. Q. Was that included in the two thousand dollars? A. I don't know whether it was or not, I don't think it was. . . . He told me, in his very words, that the two thousand dollars would put him on his feet, and then he would commence paying me back. Q. And didn't tell you that two thousand dollars was all he owed? A. That's the way I understood it, what that means—put him on his feet. . . . Q. Didn't he say one hundred dollars he could save would enable him to pay you and pay Banker? A. No, I don't think he did. He said that Banker was easy on him and I don't remember how much, but I understood it was not very much. Q. You knew he owed on the car? A. He talked about that. . . . He would set aside one hundred dollars and whether he would pay Banker too—I guess he would. . . . Q. . . . Did he tell you that he could save one hundred dollars and pay off Banker and pay you? A. I think he did. Q. When he told you that he owed two thousand dollars, . . . did that include Banker? A. I don't know whether it did not not. . . . Q. And all he said that made you believe he owed only two thousand dollars was the fact he said two thousand dollars would put him on his feet? A. Well, that and what he had on the statement and all of the conversation, . . . from his own conversation and all of his talk. Q. . . . Was there anything said about a chattel mortgage in the December conversation? A. . . . I think so. Q. Are you positive? A. I am not sure, no. . . . I couldn't swear but I think there was, nothing said he was not going to give me one, I will say that. . . . Q. Did you ever mention the mortgage to him (after the December meeting)? A. Never had an opportunity. I was away the biggest part of January and

all of February, and came back the first of March. . . . I
think I was away a week or ten days (in December), I am
not sure. . . . Q. And during none of that time that you
were here in the month of December did you call Doctor
Mace up and ask him why he didn't give you the mort-
gage? A. No, I trusted him."

Redirect examination: "Q. And . . . when he was talk-
ing to you, . . . he had a list in his hand? A. He had
it on the desk making figures on it while talking. We
talked there for an hour. Q. And he discussed his financial
situation from a reading of that list? A. Absolutely, went
over his entire proposition from the time he came here.
. . . Q. And as I take it, you talked it over carefully and
he represented he didn't owe anyone except those he men-
tioned to you from the list? A. Absolutely, . . . I says,
'Whatever the liberty bond brings under a thousand I will
credit that on the note,' . . . and he said, 'I will attend to
this.' He was very anxious to get his mitts on the bond."

Recross-examination: "Q. . . . His promise to go to San
Francisco and pay off the outfit and come back and give
you a chattel mortgage . . . and his representation that two
thousand dollars would put him on his feet, those were the
two things that induced you, and were the sole inducing
factors, to get the money? A. Well, I guess that's about
right. I was sorry for the fellow and thought he was telling
the truth and trying to help him. . . . Q. . . . His prom-
ise to give you a chattel mortgage and his statement that
two thousand dollars would put him on his feet, . . . were
those the only representations that you relied on? A. Well,
I guess that's about all."

Redirect examination: "Q. And if you believed from his
list and from what he told you, that he owed more than two
thousand dollars and that would not have put him on his
feet, would you have let him have the money? A. Abso-
lutely not. . . . Q. And all these things combined, all his
representations, caused you to part with your money? A.
I guess so, those were the main representations and in the
whole transaction I relied upon what he told me as being
truthful and I let him have the money. . . . Q. . . . Do
you remember an occasion when B. M. Bucknell was in your
chambers and yourself was there and also Doctor Mace? A.
I remember it. . . . It was just a day or two after the filing

of the petition in bankruptcy, . . . along the second, third, fourth or fifth of March, . . . I says, 'Doctor, this is a great surprise to me. . . . Why didn't you come to see us and tell us you were going through bankruptcy and give us an opportunity to protect ourselves. You have sold your place before you went into bankruptcy and collected all you could collect and left us in the dark,' or words to that effect, and I said, 'You didn't tell me anything about owing sixteen thousand dollars, why didn't you tell me that,' and he says, 'I don't know, I should have told you but I didn't, I see I made a mistake now.' "

Relative to the conversation last mentioned, Bucknell testified: "Judge asked him (defendant) why he didn't tell him that he owed this sixteen thousand dollars at the time he wanted that loan. . . . He said nothing, only he said he didn't know why he didn't." M. H. Iverson, an attorney at law, testified that, as a representative of Preston, he had an interview with the defendant on the 7th of March, 1923, and that the latter stated that he did not promise to give Preston a mortgage to secure payment of the note for $1,200 and said: "I couldn't give a chattel mortgage on the machines at that time because I owed more than that on them," that the promise to give a chattel mortgage was conditional upon securing a loan of $2,000; that in his conversation with the defendant the witness "had mentioned an X-ray machine and some kind of lamp."

At the time of obtaining the money from Preston, the defendant was indebted to Bucknell in the sum of $1,500 on two unsecured promissory notes; $1,000 to a bank in Ukiah on a note indorsed by Bucknell; $400 as indorser on a note to another Ukiah bank; $341 to a contractor there; $217 on an open account with a druggist; more than $1,000 to creditors in Colorado; $359.21 on an open account with the Victor X-Ray Corporation of San Francisco; a balance of $593.20 on a lease contract for the purchase of quartz lamps from the same corporation; $1,942 on a lease contract for the purchase of furniture from O'Connor Furniture Company of Santa Rosa; $600 on a lease contract for the purchase of an automobile from Floyd Banker of Ukiah; $7,700 on a contract for the purchase of defendant's home; and various other smaller sums on running accounts with business men and firms in Ukiah. Payments had been made on

all these contracts and it may be inferred that in every case the value of the property exceeded the balance unpaid thereon and that, therefore, such balances were not liabilities in the ordinary sense of unsecured debts. The defendant testified that his wife sold her equity in the home, and it is therefore to be inferred that it belonged to her and was of greater value than the balance due thereon. All the other property held by defendant under the contracts mentioned was redelivered to the sellers thereof. The defendant collected all moneys due him on account which he was able to collect, during the month of February, 1924, and, according to his testimony, at the time he filed his petition in bankruptcy, there remained due him on accounts about $2,000, the value of which does not appear. These uncollected accounts were his only assets. Since his general, unsecured debts amounted to more than $5,000 at the time of the alleged false pretenses, it follows that he was then insolvent.

Shortly after obtaining the $1,200 from Preston, the defendant paid the Victor X-Ray Corporation the sum of $100 and made such additional purchases as to increase his indebtedness to that corporation to a total of $1,249.53. He entered into a new agreement with the corporation by the terms of which he held the property so purchased and the aforesaid quartz lamps under lease contract for the purchase of the same, title to be transferred to him upon payment of the $1,249.53. He also gave another person a mortgage on the X-ray machine as security for a prior debt and an additional loan to him of $100 in cash.

It is unnecessary to set out in detail defendant's testimony in denial of that given by the prosecution. At most it only creates a conflict in the evidence, the determination of which was within the exclusive province of the jury. The defendant denied having represented that he was solvent or that he owed but $2,000, but testified that he told Preston that his pressing debts amounted to that sum. After stating some of the debts which he told Preston he owed, he testified: "I stated I owed at that time about six hundred dollars on the car and five hundred dollars and something on the quartz lamps and would like to pay those two items off so I would only have my house and furniture. I was buying the furniture and house on contract, and if I could eliminate my payments on the quartz lamps and the automobile it

would give me a leeway to work on, which I figured would take about eleven hundred dollars, and the other, the balance of nine hundred dollars was to go to paying pressing claims of indebtedness to surgical houses and the Commercial Bank and private individuals in town here." The defendant's statement to Preston that, after payment of the debts enumerated, "I would only have my house and furniture," evidently meaning that he would have only them to pay for, implies that he represented that $2,000 would pay his other debts. The defendant testified that his indebtedness to William Langford in Colorado was one of his pressing debts, and that he paid him $150 out of the money he received from Preston, yet he did not mention this debt to Preston. Preston's testimony is further corroborated by that of Bucknell that the defendant stated "he didn't know why he didn't" tell Preston that he owed $16,000, by defendant's conduct after obtaining the money, and by all the attending circumstances shown by the foregoing testimony of defendant and other witnesses. [1] "In this class of cases the circumstances connected with the transaction, the entire conduct of the defendant, and his declarations to other persons are proper matters for consideration of the jury, and may be looked to to furnish the corroborative evidence contemplated by the law." (*People* v. *Wymer,* 53 Cal. App. 204, 206 [199 Pac. 815, 816]. See, also, *People* v. *Martin,* 102 Cal. 558, 564 [36 Pac. 952]; *People* v. *Haskins,* 49 Cal. App. 640, 644 [194 Pac. 43].)

From Preston's testimony as a whole, it fairly appears that the defendant made representations which were calculated and intended to create the belief that he was solvent and that $2,000 would pay his debts and that the prosecuting witness so believed and was thereby induced to part with his property. It is true that, after stating positively that the defendant made such representations, in answer to questions asked him on cross-examination as to whether defendant's promise to give a chattel mortgage and his statement that $2,000 would put him on his feet were not the "sole inducing factors," the prosecuting witness replied, "I guess that's about right," and to a similar question, "I guess that's about all," but his prior and subsequent testimony, as herein set out, shows that he relied on all the statements made by defendant in their lengthy conversation relative to

the defendant's financial affairs, including the written list of liabilities. [2] The defendant had put the interview upon a confidential basis, saying, "I don't want anybody to know I have to borrow money . . . but I thought I could trust you." According to defendant's testimony, Preston said "he was trying to help me as he knew how hard it was for a young fellow to get a start, as he had done it himself and understood how hard it was." Under such circumstances common honesty and fair dealing required, and Preston was justified in assuming, that the defendant would make a full disclosure of his financial condition and, when the defendant made a list of his debts, such statement implied that he did not owe other debts. "The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact" is a deceit. (Civ. Code, sec. 1710, subd. 3.) [3] It is not necessary to sustain the charge that the defendant should have stated expressly that he was solvent or that $2,000 would pay his debts, if all of his statements together reasonably created a belief to that effect. "A false pretense may consist in any act, word, symbol, or token calculated and intended to deceive. It may be made either expressly, or by implication. . . . The form of words in which the pretense is couched is immaterial; if they are intended to create and do create the impression that defendant is making a representation as to a present or past fact, the pretense is within the statute." (25 C. J. 610.) [4] While the defendant's false statement that he needed the money to finish making payments on the purchase price of the X-ray machine and his false promise that he would use the money to make such payments and then give Preston a mortgage upon it and other property, coupled with his subsequent acts of mortgaging the X-ray machine to secure money from another person and increasing the existing encumbrance upon the other property, are not of themselves sufficient to sustain the charge, they tend strongly to establish the fraudulent intent necessary to constitute the crime. The fact that the indebtedness upon defendant's home was of public record did not charge Preston with knowledge thereof or of its amount. (*People* v. *Henninger*, 20 Cal. App. 79 [128 Pac. 352]; *People* v. *Bowman*, 24 Cal. App. 781 [142 Pac. 495].)

[5] In the foregoing discussion, the written list of the defendant's debts, used upon the application for the loan, has not been treated as a false token, as it clearly is not such. From a consideration of all the evidence it cannot be said that it is insufficient to justify the verdict.

The judgment and the order are affirmed.

Hart, J., and Plummer, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 30, 1925.