[Crim. No. 2291.   Second Appellate District, Division One.—February 13, 1934.]

THE PEOPLE, Respondent, v. HENRY A. REESE et al., Appellants.

Richard L. North, R. E. Parsons and Joseph L. Fainer for Appellant Carter.

Kirtland I. Perky for Appellant Reese.

U. S. Webb, Attorney-General, James S. Howie, Deputy Attorney-General, Buron Fitts, District Attorney, and Tracy Chatfield Becker, Deputy District Attorney, for Respondent.

THE COURT.—This appeal of the defendants is from judgments of conviction against each of them, and from orders denying their motions for new trial. They were both convicted by verdicts of the jury on an indictment against them, including one charge of conspiracy, ten counts of grand theft, and six counts of violation of the Corporate Securities Act.

The sufficiency of the evidence to sustain the judgment as to each of the several counts on which the defendants were convicted of the crime of grand theft is challenged. In that connection, an inspection of the record reveals the fact that the incriminatory evidence, as it affected the offense charged in count 9 of the indictment, in substance was that one Castle was the owner of a ranch that was encumbered by a mortgage of $14,500, and that a Mrs. Twedell was the owner of a bungalow court that was encumbered by a mortgage of $8,000. The owners of said respective properties agreed to an exchange thereof on the basis that the $8,000 on the bungalow court would be increased to $12,000, and that Castle would receive 4,000 shares of stock in a mining company. Pursuant to the terms of the escrow that was made by the parties to the exchange agreement, and of which Castle not only was cognizant but actually had personal knowledge, the $4,000 realized from the increase of the loan on the bungalow court was paid, not to either of the defendants herein, but was paid $3,500 thereof to Mrs. Twedell, and the remaining $500 to one Mitchell. In no way was it shown that either of the defendants received any benefit in any way from the exchange, or from the transaction in general, other than that long after the exchange had been made the defendants became the owners of the encumbrances on each of the exchanged properties. According to the testimony of the complaining witness, the only way in which the defendants were connected with the transaction was that on one occasion, when negotiations for the exchange were pending, Mrs. Carter was present, at which time "she said if they could get money enough to go ahead they would start to mine, and this $4,000—she didn't mention this $4,000—if they could get enough money together they would start mining in sixty to ninety days. . . . They were going to use it to install machinery, . . . She said that they were going

to use the money to install bigger machinery in the mine and that the mine would start in sixty to ninety days on a 100-ton production.''

Regarding the question of the sufficiency of the evidence as it affects count 10 of the indictment, it appears from the testimony given by the complaining witness that defendant Mrs. Carter asked to ''borrow'' $500 from her for thirty days, for which Mrs. Carter agreed to pay ten per cent interest and give the complaining witness 500 shares of stock as a bonus; that at that time Mrs. Carter said she wanted the money ''to put the mine on production, . . . trying to raise money to put the Virginia Dale Mine on production''. But other evidence introduced with reference to the commission of the alleged offense has the effect of creating considerable doubt as to whether Mrs. Carter ever borrowed any money from the complaining witness, or that Mrs. Carter or defendant Reese ever received the benefit of any money lent by the complaining witness. It was shown very clearly, if not conclusively, that one Blehm was the borrower; that he, together with the defendants and one other person, signed a promissory note; that it was Blehm's own stock in the company that was given as a bonus; that he alone gave the complaining witness a ''memorandum contract'', and that it actually represented a fractional interest of his own undisputed interest in the mine; and that when the complaining witness delivered the money or her check it was not to either of the defendants, but to said Blehm.

As to count 11 of the indictment, it appears that a Mrs. Lasher, who was a woman well advanced in years and whose testimony was given approximately three years after the transaction of which she complained occurred, and whose various statements were confused, inconsistent and at times contradictory one with the other, was to the effect that she let Mrs. Carter have a lot and some cash, for which the father of Mrs. Carter gave to Mrs. Lasher his promissory note; that later, at the request of the complaining witness, defendant Reese gave to her nephew a ''conveyance memorandum'' of a fractional interest in the mine. In connection with this count, the alleged false pretenses of the defendants consisted in the following: ''She (Mrs. Carter) thought the mines were all right—she thought the mines were all right, and she wanted to borrow my money to put in the mines,

and she wanted to put some machinery in, so she could run it night and day.''

And as to whether the complaining witness relied upon the statements made to her by Mrs. Carter, the sum total of the incriminatory evidence was:

''Q. Did you believe Mrs. Carter when she told you she wanted your money to put in new machinery at the mine? A. I never had confidence in anybody better than I had in her. The Court: That might be true, but that doesn't tell us whether you believed in her, or not. You might not believe in anybody. A. I did believe in her. Q. And you relied on her statements in giving her this money and these lots? A. I did. Q. Would you have given them to her if you had not believed in those statements and relied upon them? A. Well, I don't know as I would. Q. Would you or would you not, if you had not believed her? A. Well, it was good interest; I was getting 10 per cent interest, and I thought that was pretty good. Q. Would you have given her the money if you had not believed what she told you? A. I don't know as I would. Q. Pardon me? A. I don't think I would. Q. You can tell me whether you would or would not, can't you? A. I had to believe— Mr. Kelby: We submit that is an answer to the question. The Court: If there has been an answer, I haven't heard it. Q. By Mr. Blalock: Will you answer the question 'yes' or 'no' for me: Would you have given Mrs. Carter this money and this lot if you had not believed her? A. No, I would not.''

Regarding count 12 of the indictment, and upon the charges of which the defendants were convicted, the evidence of the alleged false pretense of the defendants in substance was as follows:

''He (Reese) told me that the mine was all right. He said the hazard had gone out of it now, because they had it thoroughly examined, and had drilled holes every sixty —I don't know whether it was sixty feet or something like that, to see if the vein went through, and he said that the mine was perfectly all right, and it would not be very long that our investment would be a success. . . . He said this (exhibiting a small gold brick) came out of the mine, and we intend to get them into $10,000 bricks, instead of these little bricks, and it will not be very long, because what we want to do is double the capacity of the mine.'' Mrs. Carter

said: "We have a good thing, Emil, and we want all our friends to get in on this. . . . First we got our relatives in, and we found we couldn't make it, so we have to take in our relatives' friends and our friends and we are going to make a million out of it before we know it."

The witness testified that *after* the money had been delivered, "Mrs. Carter grabbed it from Reese because I handed it to Reese and I thought it looked kind of funny to me, and then she gave the money back to Mr. Reese, and she said, 'Don't worry; this is like a big family.' He said, 'Your money, my money, everybody's money is going to that one thing,' he says, 'to that mine'."

On respective representations made by the defendants thereafter, the witness gave to the use of the defendants various amounts ranging between $100 and $275, at which times respectively it was stated that "it sure came in handy, because the men were up there (at the mine) starving, and they had to have some groceries for them; . . . they had to have it real bad; . . . they were in a pinch again".

A summary of the alleged false pretenses as applied to each of the foregoing counts of grand theft, discloses the following facts upon which the conviction of the defendants must ultimately depend:

As to count 9: That with reference to the $4,000 which was realized by one of the owners of the exchanged properties from the increase of a mortgage on property exchanged by her, of which sum no part actually was received by defendants,—one of the defendants, who had gratuitously given to the other party to the exchange 4,000 shares of stock in the mine, stated that "if they could get enough money together they would start mining in sixty to ninety days; . . . they were going to use it to install machinery, . . . bigger machinery for the mine, and that the mine would start in sixty to ninety days on a 100-ton production".

As to count 10: That as to the $500 which one of the defendants "borrowed" from the complaining witness, which in fact apparently was actually borrowed by another person, one of the defendants stated that she "wanted the money to put the mine on production; . . . trying to raise money to put the Virginia Dale Mine on production. . . ."

As to count 11: Even assuming the correctness of the story of the complaining witness, or that it was true (which in fact is extremely doubtful) that in lending the money to one of the defendants the complaining witness believed in and relied upon statements made to her by said defendant and thereby was induced to part with her money, from the record it appears that all that said defendant stated to such witness was that "she thought the mines were all right, that she wanted to borrow my money to put in the mines, and she wanted to put some machinery in, so she might run it night and day".

As to count 12: The alleged false representations consisted substantially in the following statements made by one of the defendants to the complaining witness: "That the mine was perfectly all right, and it would not be very long that our investment would be a success; . . . because what we want to do is to double the capacity of the mine. . . . We have a good thing, . . . and we are going to make a million out of it before we know it."

And *after the money had passed,* one of the defendants said: "Your money, my money, everybody's money is going to that one thing; . . . to that mine."

Later, at different times, none of which was the subject of the indictment herein, one of the defendants stated that the small sum of money then given by the complaining witness to said defendant "came in handy", etc.

From a consideration in gross of the several alleged false pretenses made by the defendants, it will thus unmistakably appear that in effect all that the defendants said may be reduced to a statement in substance that they were attempting to raise money and that the money would be used for the purpose of installing machinery in the mine; thus placing it on a greater production basis; or to buy groceries for the use of men who were working in the mine; or to relieve the mining company from a "pinch".

It is more than doubtful that any one of any such representations, or all of them combined, as applied even to each of the several counts (9, 10, 11 and 12), may be said to measure up to the standard defined by judicial interpretation of the statutes which relate to the crime of theft committed by means of false pretense. In 12 California Jurisprudence, at page 452, the rule is declared to be "that the

representation must be of a present or past fact, not a mere expression of opinion, *or a representation of an act to be performed in the future,* as a mere promise to pay or *perform some act. . . .* '' ■ Even if a construction of the assumed representation made by either of the defendants will admit of a conclusion that what they promised was that the money which they either borrowed or received from either of the complaining witnesses would be used for the purpose of placing the mine on production, still it is insufficient as a basis for a conviction of the crime charged.

In the case of *People* v. *Mace,* 71 Cal. App. 10, page 21 [234 Pac. 841, 845], wherein it appeared that the defendant had procured money upon his representation that he would use it for a particular purpose,—the court said:

'' . . . While the defendant's false statement that he needed the money to finish making payments on the purchase price of the X-ray machine and his false promise that he would use the money to make such payments and then give Preston a mortgage upon it and other property, coupled with his subsequent acts of mortgaging the X-ray machine to secure money from another person and increasing the existing encumbrance upon the other property, *are not of themselves sufficient to sustain the charge,* they tend strongly to establish the fraudulent intent necessary to constitute the crime. . . . '' (See, also, *People* v. *White,* 85 Cal. App. 241 [259 Pac. 76].)

In a notation occurring in 24 American Law Reports, at page 402, and where the authorities therefor are cited, the rule is stated that:

''Under the rule that the false pretenses must relate to a past or existing fact, and that the crime is not committed where the inducement is a promise to perform some act in the future, a person is not guilty of the crime of obtaining money by false pretenses where he obtains a loan of money solely by means of false pretenses concerning the use to be made of the money. (Citing authorities.) Thus, it has been held that a person was not guilty of obtaining money by false pretenses where the false pretense relied on was the statement that the loan was to be used to pay rent. (Citing authorities.) And it has been held that a person was not guilty of obtaining money by false pretenses where the facts showed that he obtained the loan by the statement

that he intended to open a public house.'' (Citing author-ity.)

To the same effect see: *People* v. *Kahler,* 26 Cal. App. 449 [147 Pac. 228]; *People* v. *Green,* 22 Cal. App. 45 [133 Pac. 334]; *In re James,* 47 Cal. App. 205 [190 Pac. 466]; *People* v. *Walker,* 76 Cal. App. 192, 205 [244 Pac. 94]; and authorities there cited.

But even though, weighed by the foregoing authorities, the legal sufficiency of the evidence in each of said four counts of the indictment should be conceded, it is apparent that, even without considering the force of opposing evidence, the case of the People, resting as it did upon the flimsiest and most unsatisfactory proof, was woefully weak. Considering such a condition, the charge here made by appellants that because of the misconduct of the court that occurred on the trial of the action the defendants were not accorded a fair trial, becomes of great and serious importance.

Although not embracing a complete list of the separate occasions on each of which it is asserted by appellants that the trial court was guilty of misconduct in the trial of the action, an inspection of the specifications of error in that regard reveals the fact that the attention of this court is directed to not less than sixty-eight separate violations of proper decorum on the part of the trial judge. A few of such specifications will suffice:

On the first day of the trial of the action, in giving the required statutory admonition to the jury, and in especially cautioning them to have nothing to do with the attorneys on either side of the case, the judge made the following remarks:

''So just be a little bit careful, please. I don't want you to think that these gentlemen all have leprosy, or smallpox, that you have to get from them, but just kindly figure that they have all got the measles, or something you don't want to be exposed to. It is just a little tip, ladies and gentlemen, because I don't want anything talked around such as I have indicated. . . . ''

Referring to objections by counsel for defendant to the reading of testimony given by a witness on a former trial of the action, and to the fact that the witness might return

to the state before the trial could be completed, the trial judge said:

"If he is (has returned to the state), anyone that wishes can put him on the stand, but the idea is to get the facts before this jury, and not to play a game to see how many points either side can win."

Without any apparent underlying reason for the statement, at one time the judge said:

"We can put on enough side-shows in this court of our own, without going into Judge White's court and copying his part of it."

Apparently with the same thought in mind, following a recess of the court and a stipulation that the jury was present, the judge remarked:

"All right, proceed. Both sides of the show are here. We might just as well go ahead."

It appears that one of the attorneys representing one of the defendants was looking into a "bag" which was the property of one of the other attorneys in the case, and the judge said:

"Judge Perky's bag; we want to make sure which judge you are talking about. I only hope it doesn't leak on you, Mr. Lawson."

When a complaining witness had testified that he had paid the sum of $20,000 to one of the defendants in connection with the sale of shares of stock, the attorney for the People asked him:

"Q. Did you get anything for that $20,000? A. Not a thing." The judge then interposed the following question: "You got experience, didn't you? A. Plenty of that."

On another occasion, the court made the following remark to a witness on the stand:

"Mr. Robinson, you are just a little too eager to answer questions without giving either side a chance to object. If you see either of these gentlemen going through gesticulations or motions that indicate that they are about to give birth to an objection, just stop a moment."

At a time when one of counsel for defendants was examining one of the witnesses on cross-examination, the judge interrupted and began to examine the witness himself. After several questions had been asked by the court,

one of the attorneys for one of the defendants interposed the following remark:

"If your Honor please, I prefer to examine my own witness.

"The Court: I dare say, but when it appears that the witness is becoming confused in matters, I am going to take a hand in order to get the thing straightened out and the facts before the jury. We are not playing a game to get the witness balled up on the witness stand."

In criticising one of the attorneys for his manner in asking questions, the judge said:

"I think we might make better time if Mr. Blalock would supply Judge Perky with one of these old-fashioned street-car bells, to let him ring it when he wants to go ahead."

During the reading of certain testimony, Mr. Perky and Mr. Kelby took turns in reading from the transcript, and upon one occasion, as Mr. Kelby was about to take up the reading, the judge made the following comment: "All right; we will listen to the reading of the Word from the Reverend Kelby now."

With reference to the proposed reading of each of several checks which had been introduced as exhibits on the trial of the action, the judge made this remark: "There is no heart or sex appeal in reading checks."

On another occasion the judge addressed the following remark to one of the attorneys for one of the defendants: "I am not particular for too much decorum in the court room, but I have never yet allowed any attorney to stand on his head; he will have to stand on his feet."

Following the cross-examination of one of the witnesses introduced by the defendants, the judge had this to say: "Are you gentlemen all through with Mr. Mort, with what is left of him? . . . All right, Mr. Mort, I guess if they are all through with you, you have been here a couple of days, and what is left of you can be excused."

One of the attorneys for one of the defendants having stated to the court that he would prepare proposed instructions for one of the defendants as soon as he could obtain a copy of the instructions offered by the People, the judge made the following remark:

"Yes, do so, as soon as you can. The idea of most instructions seems to be to confuse the jury, or to try to confuse them as far as possible."

It appears that counsel for the People had a book which belonged to Judge Perky, who was one of the attorneys for one of the defendants, and that Judge Perky had made an inquiry for it; whereupon the judge remarked:

"Well, I don't think anyone would want to take a date book away from you, Judge Perky, particularly if it contained any live telephone numbers."

At a time when the court had commented upon the testimony given by one of the witnesses for the prosecution to the effect that he did not think that the attorneys for the defendant "should put a sort of shotgun statement to her answer", without any objection thereto having been interposed by either of the attorneys for either of the defendants, the judge said:

"If you want an exception, however, I will give you an exception. In fact, I will give you another exception for good measure on account of the depression." To which remark one of the attorneys said: "Well, I wish to take an exception to the statement of the court. The Court: Well, I will give you another one on that; only one on that, however. I cannot give you too many bargains."

In cross-examination of a witness on attempted impeachment by one of the attorneys for defendant, he asked a question which had a tendency to distinguish between two persons who bore the same name. In connection therewith, the judge made the following remark: "Well, it is assuming facts not in evidence. In the first place, it is assuming that she is particular. We don't know whether she is or not. . . ."

During the examination of a witness, reference was made to the kind of work which he was doing, and the court said: "What was he doing, flagpole sitting?"

Referring to another witness, the court said: "Well, he has made his explanation of why he made a certain remark, indicating a tendency, perhaps, to commit the crime of mayhem."

Referring to the fact that one judge may not agree with another with reference to some question of law, the judge of the trial court made the following disparaging remark:

"He (Judge White) might have made a different ruling on some question than I might have made. We do not always agree, and that is why we have Supreme Courts, and rubber mats on the cuspidors. . . . "

As indicating what the judge of the trial court thought of the mine in question, the following remark of the trial judge may be cited: "In other words, you don't contend that that *hole in the ground* had ore in it, or didn't have ore in it."

Commenting upon certain proposed exhibits in the case, the judge remarked: "Are you about to introduce the three wise monkeys as an exhibit here?" Whereupon counsel for the prosecution said: "There is only one prosecution counsel. The Court: Gentlemen, it is practically twelve o'clock, and I think that is a happy thought to adjourn with."

Extended comment would seem to be unnecessary. In cases too numerous to properly admit of citation thereof, because of judicial misconduct that was insignificant compared to that which so unmistakably appears in the instant case, the respective judgments therein were reversed. But flagrant as misconduct of the trial court in a given case may be, unless it clearly appear that its probable effect was prejudicial to the substantial rights of the party affected by the litigation, and that probably it resulted in a miscarriage of justice because thereof, an appellate tribunal is forbidden to set aside the judgment or to grant a new trial. (Sec. 4½, art. VI, Const.) However, as to counts 9, 10, 11 and 12 of the indictment herein, and as to which the evidence adduced on the trial of the action was weak and unsatisfactory, aside from the legal insufficiency of the evidence to support a verdict of guilt as hereinbefore set forth, when the opposing evidence in each of such counts, together with the misconduct of the trial court is considered, it becomes a practical certainty that without, or in the absence of, such misconduct a verdict of "guilty" would not have been returned by the jury against either of the defendants as to either of such counts.

In relation to the remaining counts 2, 3, 4, 5, 8 and 13, charging grand theft; and counts 14, 15, 16, 17, 18, 19, charging violations of the Corporate Securities Act; and count 1, charging the crime of conspiracy, in violation of section 182 of the Penal Code; the evidence is so much more clear and strong in proof of the alleged offenses, that the

errors which have been discussed in the foregoing pages would not alone justify a reversal of the judgment of conviction on those counts, nor a reversal of the order denying the motion for a new trial. There are, however, other assignments of error to which we think some attention should be given.

■ Referring to the charges of violation of the Corporate Securities Act, appellants contend that "under no view of the law as it existed during the period covered by the indictment could the defendants, or either of them, be guilty of violation of the Corporate Securities Act". In the absence of a clear statement of the questions presented or of the errors asserted, it is necessary to read the briefs with pencil poised in air, to find and mark the points which should have been separately stated under appropriate headings as the rules of court require. It appears that appellants are contending that they were, as owners of mining property, a mining partnership subject to the law of mining partnerships in California; that under that law they had the legal right to sell, transfer and convey undivided interests in mining property owned and operated by them, without leave, let, hindrance or permission from any source; in other words, that the Corporate Securities Act has no application to mining property owned by a mining partnership. Appellants further contend that the undivided interests which were sold by them were not "securities" within the meaning of the Corporate Securities Act, as the word "securities" therein was defined prior to the amendment thereof which became effective August 14, 1929. (Stats. 1929, p. 1251.) Appellants refer to paragraph 8 of section 2 of the Corporate Securities Act as amended in the year 1925, defining the word "security", in so far as it applies to "individuals", as follows: "(a) Any instrument offered to the public by an 'individual' evidencing or representing any right to participate or share in oil, gas or other hydrocarbon substances or other minerals of any sort, as yet undeveloped, or in the proceeds of sale thereof." And in paragraph 7, subdivision (b), the same definition is found, of a "security" offered to the public by a "company". (Stats. 1925, pp. 962, 964.) The particular point suggested is that since it was a conceded fact that the Virginia Dale Mine was a fully developed mine, the certificates issued by them prior to

August 14, 1929, representing a right to share in the minerals contained in said mine were not "securities" within the meaning of the statute. The charges set forth in counts 14, 16 and 18 relate to sales made prior to August 14, 1929. But counts 15, 17 and 19 are founded upon sales made in the year 1930. The amended section 2, as found in the Statutes of 1929 (p. 1251), in paragraph 7 of the section, includes in the word "security", any "certificate of interest in an oil, gas or mining lease, collateral trust certificate, preorganization certificate, preorganization subscription, any transferable share, investment contract, or beneficial interest in title to property, profits or earnings or any other instrument commonly known as a security". In this 1929 amendment the former distinction between mining property "as yet undeveloped", and other mining property, seems to have been omitted.

Appellants, in discussing the law upon this aspect of the case, quoted at length from *People* v. *Pace,* 73 Cal. App. 548, 562 [238 Pac. 1089], as supporting their right (without any permit obtained from the corporation commissioner), to convey to purchasers, undivided interests in mining property, subject to the contemplated organization of a corporation for the purpose of carrying on the business of said mining partnership, and with intention to issue certificates of stock representing the interests thus conveyed. *People* v. *Pace, supra,* is one of a series of cases in which the courts were asked to explore and find the limits of legislative authority to regulate the business of selling securities. These cases were considered, and their application to the statute was more definitely limited, in *People* v. *Craven,* 219 Cal. 522 [27 Pac. (2d) 906]. Craven was convicted of violation of the Corporate Securities Act. Craven had sold and issued certificates of interests in oil and gas leases (his own property) without securing a permit therefor from the commissioner of corporations. Three counts of the indictment against him related to sales made in June, 1929, a time when the 1929 amendments to the statute were not yet in force. In this respect the said three counts against Craven and some of the transactions in the case at bar are alike; that is, they were prosecuted as violations of the Corporate Securities Act, and particularly of section 2, paragraph 8, subdivision (a) thereof, prior to amendment in 1929. The

difference between these cases is, that Craven sold certificates of interest in "oil and gas leases" of property as yet undeveloped for oil or gas, whereas the sales made by Reese and Carter were sales of certificates representing interests in a mining property which had been worked to the point where it was not "undeveloped". Thus it would seem that if the convictions in this case, of violations of the Corporate Securities Act prior to August 14, 1929, are to be sustained, there first must be proof of something more than a mere sale of certificates of interests in the mining property without having obtained a permit therefor. This burden of proof, however, respondent contends, has been sustained by the evidence, and with this contention we agree. The evidence tends to prove, and the jury had the right to find, that the real intention of the defendants was to place upon the market and sell shares of stock in a corporation, and that the form of the certificates issued by them was a subterfuge adopted in order to defeat the purposes of the Corporate Securities Act. The operation of the law may not thus be circumvented. (*People* v. *Ratliff*, 131 Cal. App. 763, 772 [22 Pac. (2d) 245].)

Appellants claim that the court erred in permitting to be read in evidence the testimony of the witness Pat Adams (given at a former trial), over the objection of appellants that sufficient diligence had not been shown in the effort to find him and serve him with a subpoena. Before said transcript of testimony was received in evidence it was shown that the witness Adams was absent from the state of California, and that although a subpoena had been issued thirty days before the present trial, service thereof had been prevented by the witness' absence from the state. These facts justify the ruling of the court by which the testimony at the former trial was admitted. (*People* v. *Day*, 219 Cal. 562 [27 Pac. (2d) 909].)

Point IV of appellant Carter: That the court "erred in sustaining an objection to the offer of proof". Under this vague and mysterious heading the brief contains numerous pages of narrative out of which we are supposed to select those which show an offer of proof and the court's ruling thereon. The gist of the contention seems to be that the court erroneously restricted the defendants in their effort to present the evidence of "the entire history" of

their activities in connection with the Virginia Dale mining property prior to the year 1928, and therefore prior to the period when the alleged illegal activities of the defendants occurred. Just what terms of an offer of testimony were before the court at the time when it made its ruling (if any was made), is not shown by the statement in the brief. From all that does appear we are of the opinion that there was no abuse of discretion and no error in ruling on the part of the court in said matter.

■ Point I of Carter brief: That the court erred in not granting to said appellant Carter a short continuance to secure counsel. At the time when the case was called for trial the defendant Carter was represented by attorneys of record, but pursuant to a statement made by them they were permitted to withdraw. Not only did Mrs. Carter make no objection, but it appeared that at least two days before the day of trial she knew of the prospective withdrawal of her attorneys and was negotiating with Mr. Kelby and Mr. Lawson to take their place. Thereupon the court appointed the public defender to represent Mrs. Carter, and a deputy of that officer came into court, but he did practically nothing except to make representations which resulted in his excuse from further attendance. The court being then about to proceed with the selection of a jury, suggested that if Mr. Kelby and the deputy public defender desired to take a little more time before proceeding he would let the case go over until 2 o'clock if that would help them out. To which Mr. Kelby replied: "It would be of some assistance." After the recess and some further discussion Mr. Perky, the attorney for the co-defendant Reese, suggested that his client was willing that he should represent Mrs. Carter during the impaneling of a jury. The court then said, "Mr. Perky will represent Mrs. Carter during the impaneling of the jury." Presumably Mr. Perky performed that duty. Before adjournment the court said to Mrs. Carter: "Do you think by tomorrow you will have arranged for someone?" To which she replied, "We will do our best." At the opening of court on the following day the jury was completed and sworn to try the cause. It appears from the record that Mr. Kelby was present representing Mrs. Carter at that time, and thenceforth he and Mr. Lawson acted for her

throughout the trial. There was no formal motion for a continuance, and there was no showing of grounds for a continuance other than the facts above summarized. We think that the court committed no error in proceeding with the trial, as it did proceed, under the circumstances shown by the record.

Appellant Reese asserts that the court erred in its instructions to the jury, and in refusing instructions requested by appellants and in modifying some of the instructions requested by them. In presentation of the argument under these assignments of error, appellant in his brief has referred to various instructions by their numbers and by very incomplete suggestion of their contents, without in any instance presenting the full text of the instruction. Neither does he present in connection with the instructions which he says were erroneously refused, the other instructions given by the court bearing upon the subjects covered by the refused instructions. Section 3 of Rule VIII of the rules governing practice in this court was ignored by the writer of the brief. In the absence of any more definite criticism concerning the instructions, we are satisfied that they were free from serious error. Apparently that was the opinion of co-defendant Carter, who has made no claim of error of the court in the matter of instructions to the jury.

For the reasons herein set forth, it is ordered that the judgments of conviction herein upon counts 9, 10, 11 and 12 of the indictment are, and each of them is, reversed, and the orders denying motions of appellants for a new trial upon those four counts are reversed; and it is further ordered that the judgments of conviction upon the other counts in the indictment be, and each of them is, affirmed, and the orders of the court denying motions of defendants for new trial as to those counts other than 9, 10, 11 and 12 are affirmed.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 15, 1934.