[Crim. No. 1381. Second Appellate District, Division One.—August 25, 1927.]

THE PEOPLE, Appellant, v. FLOYD G. WHITE, Respondent.

U. S. Webb, Attorney-General, John W. Maltman, Deputy Attorney-General, Asa Keyes, District Attorney, and A. H. Van Cott, Deputy District Attorney, for Appellant.

Edward N. Barnard and Guy Eddy for Respondent.

SHAW, J., *pro tem.*—This is an appeal by the People from an order granting a new trial. The respondent and two others were tried on an indictment containing nine counts, of which the first charged a conspiracy by the defendants to obtain money by false pretenses from Mrs. Catherine Bayne Stephens, Mrs. Lunette W. Smith, and other persons to the grand jury unknown, and set up eight different overt acts alleged to have been committed in pursuance of the conspiracy, and the subsequent counts dealt specially with the same transactions which were alleged as overt acts in the first count, charging as to each of them that the defendants had committed the offense of obtaining money by false pretenses. During the trial the indictment was dismissed as to one of the defendants, who thereupon testified for the prosecution. No evidence being given in behalf of the defense, the case was submitted to the jury on the evidence of the prosecution, and the court advised the jury to acquit both defendants remaining in the case upon all of the counts. The jury followed this advice as

to one defendant, but not entirely as to the respondent, who was acquitted upon the first eight counts and convicted upon the ninth count. Thereupon respondent made a motion for a new trial, specifying as one of the grounds thereof the insufficiency of the evidence, and the court granted the motion on this ground alone.

The rules governing the consideration of appeals such as this are well established. The case of *People* v. *Knutte*, 111 Cal. 453 [44 Pac. 166], is parallel with that now before the court in many respects. There the offense charged was obtaining money by false pretenses, the case was submitted to the jury on the evidence of the prosecution alone, the court advised the jury to acquit, but instead they found the defendant guilty, and the trial court made an order granting a new trial, from which the people appealed. In affirming this order the supreme court said:

"The case was argued here by both parties upon the assumption that the new trial was granted upon the ground that the evidence was deemed insufficient to sustain the verdict; and while no specific ground is stated in the order of that court, it may be safely taken, from the court's action in advising the jury to acquit, that this assumption of counsel is correct. It has been so repeatedly held here as to become axiomatic that where a new trial is granted upon this ground, or where it is one of various grounds upon which the trial court may have based the order, its action will not be disturbed, except in a case showing a manifest and unmistakable abuse of discretion. . . . While it is the exclusive province of the jury to find the facts, it is nevertheless one of the most important requirements of the trial judge to see to it that this function of the jury is intelligently and justly exercised. In this respect, while he cannot competently interfere with or control the jury in passing upon the evidence, he nevertheless exercises a very salutary supervisory power over their verdict; in the exercise of that power he should always satisfy himself that the evidence as a whole is sufficient to sustain the verdict found, and, if in his sound judgment, it is not, he should unhesitatingly say so, and set the verdict aside. (*People* v. *Lum Yit*, 83 Cal. 130 [23 Pac. 228].)

"It can, of course, make no difference in the exercise of this power by the court that the evidence in the case

was wholly that of the prosecution, and stands, in the sense at least that it is not controverted by evidence on behalf of defendant, without conflict. The same duty rests upon the judge in such a case as where the evidence is conflicting, to satisfy himself that guilt has been established; and notwithstanding the evidence may be all one way, he is not required to believe it. . . .

"Nor does it affect the question that the evidence in the case may have a legal tendency to prove all the material facts. Guilt is to be established beyond a reasonable doubt; and while there may be some evidence to support each fact, this does not signify that it is necessarily such as to satisfy the conscience of the judge that a case is made which warrants conviction."

No decision in conflict with these rules can be found, and in *People* v. *Canfield*, 173 Cal. 309 [159 Pac. 1046], which likewise involved an appeal by the people from an order granting a new trial, the supreme court said, after referring to article VI, section 4½, of the constitution:

"But this section of the Constitution was not designed to take from the trial court and transfer to the appellate courts the high discretion vested in that tribunal. The judge who presided at the trial of the cause, who heard the testimony, who observed the jurors and had an opportunity also of testing the truth of the defendant's statements by noticing his demeanor, was in a peculiarly favorable position for determining justly the question whether or not the defendant had been accorded a fair trial. . . . We can hardly manufacture in fancy a hypothetical situation in which a reviewing court would be justified in questioning the discretion of a trial court who should grant a new trial in a case involving a criminal charge."

The false pretenses alleged in counts 2, 3, 4, and 5 related to the affairs of the Interstate Oil Corporation, and those alleged in counts 6, 7, 8, and 9 related to the Brown Process Company. The several counts relating to the Brown Process Company are identical as to the party defrauded and the false representations charged, differing only as to the dates and the amounts obtained by the alleged false pretenses. The eighth and ninth counts are alike, even as to the dates on which it is alleged the false pretenses were made and the money obtained. The ninth count, upon

which respondent was convicted, charged that the offense was committed on January 17, 1924, and that on that date the defendants, with intent to defraud Mrs. Catherine Bayne Stephens of her money and property, falsely represented to her "(1) that they, the said defendants, had on hand for sale certain forty-six (46) gas units and interests of a corporation, by name the Brown Process Company, (2) which said gas units and interests were then and there of the value of One Thousand Dollars ($1,000.00) each, (3) and that the same were then and there earning and paying a dividend of thirty-three per cent (33%) per annum, upon the basis of a value of One Thousand Dollars ($1,000.00) for each of said gas units and interests of said Brown Process Company, (4) that, if she would purchase these certain gas units and interests of said Brown Process Company, she would immediately commence to receive and would continue to receive dividends of thirty-three (33%) per cent per annum, payable on the twenty-second of each month, (5) and that within three (3) years from the time of said purchase of said gas units and interests, the money she would pay them for said gas units and interests would be returned to her by the said defendants, (6) that the said gas units and interests of the Brown Process Company were secured by the total assets of the said corporation of the actual cash value of one million dollars; (7) that, if she, the said Mrs. Catherine Bayne Stephens,. would then and there pay over and deliver to them the sum of Forty-six Thousand Dollars ($46,000.00)̍, lawful money of the United States and then and there the personal property of her, the said Mrs. Catherine Bayne Stephens, the said defendants would then and there sell and deliver to her, the said Mrs. Catherine Bayne Stephens, forty-six (46) gas units and interests of the said Brown Process Company, a corporation as aforesaid." (For convenience of reference we have inserted the numbers in parentheses before the several representations alleged.) Following this are the necessary allegations to complete the cause of action, showing the falsity of the representations and defendants' knowledge thereof, belief in the truth of the representations by Mrs. Stephens and her payment of $46,000 to the defendants in reliance thereon. No point is made as to the latter allegations, and hence we do not state them in detail.

The appellant contends that the evidence not only justified but required a verdict of guilty on the ninth count, and that for this reason the trial court erred in granting a new trial. Appellant's argument mainly revolves about the representation which we have numbered 3, its claim being in effect, though not in words, that all the necessary allegations in regard to that representation were proved beyond a reasonable doubt. ■ In this sort of cases, however, a verdict of guilty may be based on any material misrepresentation alleged in the indictment, if the evidence in regard to it is sufficient, although as to others the proof fails. For this reason it is necessary to give some consideration to all the false pretenses charged in the ninth count.

It clearly appears from the evidence that, as a part of the transaction referred to in this count, Mrs. Stephens entered into a certain written contract with Brown Process Company. All the representations made by respondent related to this contract, and in order to consider them intelligently it is necessary to have in mind its principal terms. The contract is dated January 17, 1924, but Mrs. Stephens testified that she did not sign it until after February 11, 1924. It recites that Brown Process Company, designated as the party of the first part, has an oil treating plant and refinery at Maricopa, in which it has invested upward of $400,000, that it is operating under dehydrating patents owned by it which greatly increase its profits, that it has purchased as a location for an additional oil refining plant eighteen acres of land in the county of Los Angeles (describing it), which is held partly by deed and partly by agreement to purchase, that it has constructed and is completing and is now operating in part an oil treating plant on said land, and that it needs additional funds to complete the purchase of the land and to complete and add to its treating plant and refinery thereon; and thereupon it is agreed that Mrs. Stephens, referred to as the party of the second part, will forthwith pay to the company $46,000 to be used by it in paying balances due on the said land and buildings and adding to the present improvements and conducting its business, that she shall have no right, title, or interest in any other property of the company, but her only interest shall be limited to the compensation referred to

in the agreement and an interest in the eighteen acres of land above mentioned and the oil treating plant thereon.

The contract also contains this provision:

"For each $1,000.00 invested by second party, first party hereby agrees to pay to second party one-thirtieth of one cent per barrel for all oil treated or topped by said refinery, but not exceeding 90,000 barrels in any one month; provided oil can be treated at a margin of eighteen and one-third cents per barrel between cost and selling price. Cost price to be the price paid for crude oil delivered at the plant, and selling price to be the net amount received from the sale of all the products derived from each barrel of oil treated.

"Should said margin be less than eighteen and one-third cents, first party shall pay to the second party for each $1,000.00 invested, one-fiftieth of the net amount received per barrel, in excess of fifteen cents per barrel, said fifteen cents per barrel being agreed to be, as between the parties hereto, the cost of treating said oil."

Following this is a provision for the keeping of accounts by the company and the inspection thereof by Mrs. Stephens, and for payment on or before the thirtieth day of each month of the amount due her on account of oil treated in the preceding month. There is also a provision that on the sale of said land and refinery in whole or in part, Mrs. Stephens shall be paid by the company " . . . such proportion of the amount received from such sale as the sum of all his investment in said property bears to the amount invested, in said entire plant, including lands and pipe line, less the amount charged off for depreciation as shown by the books of the first party at the time of such sale." The contract also declares that the parties are not partners or joint adventurers, and should either sustain a loss the other shall not be liable to contribution therefor, and that the company reserves the right to purchase all rights of Mrs. Stephens under the contract on giving her a certain notice and paying her "the amount originally advanced" by her, plus ten per cent, and provides that additional contracts of like character may be made by the corporation with Mrs. Stephens or with other parties.

The exact nature of this contract is a matter of some doubt, for it does not readily lend itself to precise classifica-

tion; but it was clearly not a subscription for or a sale of any of the capital stock of the corporation, and it gave Mrs. Stephens no interest in such stock. It is also clear that by the terms of the contract she has no right in the net profits or surplus of the corporation as such. Its obligation to pay her a specified amount per barrel of oil treated or topped, while not mature and enforceable until the thirtieth day of the following month, becomes absolute in all other respects as soon as each barrel of oil is run through the refinery, or at least upon a sale of the products derived therefrom, and cannot be defeated or affected by proof that its entire business shows a loss instead of a profit. Payment on this obligation can be compelled from any assets of the corporation regardless of whether they are such as may lawfully be used to pay dividends on its stock.

The respondent contends that there was a variance between the indictment and the proof as to representation No. 1, basing his argument upon a claim that what he offered to Mrs. Stephens was not properly described as "gas units and interests," and could not be the subject of sale. Several similar contracts were made by Mrs. Stephens with the Brown Process Company through the solicitation of respondent, and in discussing them with her he referred to them sometimes as "units" and sometimes as "contracts." He also negotiated a similar contract with the witness G. A. Stephens, and while so doing referred to such contracts as "units." The contracts referred to created in the parties dealing with the corporation some sort of an interest, the nature of which we do not find it necessary to define exactly, in a certain oil refinery and oil treating plant of the corporation in which gasoline would of course be produced. The word "gas" is a common abbreviation for gasoline, and was doubtless so used in the indictment. The contract cannot be described with complete accuracy in any short form of words. In view of these facts, we do not see how the respondent could have been prejudiced by the designation of these contracts as "gas units and interests," or by the reference to the making of them as a "sale," even though it be conceded that these terms are not accurate and precise descriptions of the matters to which they were so applied. The language used was sufficient to inform respondent of the charge which he was called upon to meet. Fur-

thermore, this representation is not the substantial matter upon which Mrs. Stephens relied in paying her money to respondent, but is a mere preliminary statement intended to identify the contract to which the subsequent representations related. It appears from her testimony that she read the contract before she signed it, and understood the nature of the payments which were to be made to her by the corporation. Under these circumstances an incorrect description of the contract by the respondent in discussing it with her would not afford a basis for a charge of obtaining money by false pretenses, and a variance between the pleadings and the proof in regard to his description of it is immaterial.

There is no evidence that representation number 2 was ever made by respondent. No representation as to the value of the units and interests was testified to by any witness. The only showing in regard thereto is in the contract itself, which states that for each $1,000 paid to the corporation by the other party such other party will receive certain returns, but does not purport to fix $1,000 as the value of the interest for which that amount is paid.

We pass for the time representation number 3, which requires somewhat extended consideration. ■ Representations 4 and 5 were manifestly either mere predictions of events to occur in the future, or expressions of opinion, and the verdict of the jury could not be upheld upon them alone. (*People* v. *Green*, 22 Cal. App. 45 [133 Pac. 334] ; *People* v. *Walker*, 69 Cal. App. 475 [231 Pac. 572] ; *People* v. *Gibbs*, 98 Cal. 661 [33 Pac. 630] ; *People* v. *Kahler*, 26 Cal. App. 449 [147 Pac. 228] ; *In re James*, 47 Cal. App. 205 [190 Pac. 466].) It is therefore unnecessary to consider the evidence in regard to these representations.

■ Representation number 7 is a mere statement of intention, the falsity of which would not support the charge. Moreover, it is unquestionably shown to be true. Mrs. Stephens on payment of her money did receive the "gas units and interests" referred to.

■ There is no evidence of the making of the whole of representation number 6. The only statement made as to security is contained in the contract itself, which clearly shows that it is secured only by an interest of some sort in the oil treating and refining plant situated on the eighteen acres of land already mentioned, and

that the corporation has another similar plant and other property which the contract does not affect. There is testimony by Mrs. Stephens that the respondent told her the corporation had assets worth over $1,000,000. The only testimony as to the total value of the assets is that they had a book value in round numbers of $1,786,000, of which $995,000 was the book value of a patented process owned and used by the corporation. There is in the record testimony that this process was of great utility and better than any other process for dehydrating oil, but no definite statement as to its value. This evidence would not justify a finding that the representation of value was false.

The only representation remaining for consideration is number 3. Respondent contends that the evidence is not sufficient to establish its falsity beyond a reasonable doubt, and we think this contention must be sustained. The purport of this representation was that contracts like that between Mrs. Stephens and Brown Process Company were then earning and paying thirty-three per cent per annum. To prove the falsity of this representation the People called as a witness W. Arthur Brown, who testified that when Mrs. Stephens was discussing her investment with respondent he was president of the corporation and in charge of its field operations and the plant in question, and was also familiar with its financial condition; that the corporation was then in need of money to carry on its business; that its current assets were always rather small as compared to its current liabilities; that the current assets at the end of 1923 were about $234,000, and the current liabilities at the same time were $733,000, and that from its entire business the corporation sustained a loss of $155,000 in 1923, and a further loss of $112,000 in 1924. Basil Jones, an expert accountant, also called by the People, testified that he had examined the books of the corporation, and he gave certain figures as to its financial condition derived from the books, which were substantially the same as those stated by Brown, but which went further back and showed that the corporation also sustained a loss in 1922. This testimony, which was not disputed, would no doubt amply establish the proposition that the corporation was not earning and was not in a position to pay any dividends on its capital stock; but, as we have already pointed out, that proposition has no

bearing on the matter now under consideration. The representation concerned the earnings then being made and paid by contracts like that into which Mrs. Stephens was about to and did enter. To discover the truth as to this matter it would be necessary to inquire into the capacity of the refinery, the amount of oil then being treated therein, the margin of profit at which it was treated, and perhaps other matters going to show whether persons who had invested in similar contracts were earning and receiving thirty-three per cent per annum on their investment. The witness Brown testified on cross-examination that at the time when the representation in question was made, the capacity of the plant was sufficient to handle 90,000 barrels of oil per month, and the corporation was able to treat oil therein at a margin of eighteen and one-third cents per barrel. If the plant was worked to its full capacity under these conditions, each $1,000 invested under the contract in question would earn $360 per year, or thirty-six per cent per annum. Brown was not asked, and no witness testified, how much oil was actually being treated by the plant at the time in question, and without this information the jury could not find that the earnings of each $1,000 were less than thirty-three per cent per annum.

In addition to the foregoing testimony there is one other circumstance bearing upon the matter. Mrs. Stephens, as appears from her testimony, invested $75,000 in a contract of the same kind on September 25, 1923, and $25,000 in another such contract on November 13, 1923, upon the same representations by respondent as were made regarding the contract referred to in the ninth count. She also testified that the first money which she received by way of income or payments from the corporation on these contracts was $2,000, received on December 20, 1923, and that she received nothing more until February 4, 1924, when she was paid $1,383.85. This was much less than thirty-three per cent per annum on her investment already made. Even assuming that each of these contracts did not begin to earn any income until the first of the month following that in which it was made, still the earnings of the $75,000 contract at thirty-three per cent per annum would have been $2,062.50 for October and a like amount for November, and the amount due for each month should have been paid to her

not later than the 30th of the following month, according to the contract, or the 22d according to the representation charged. In December the earnings of the two contracts should have been $2,750, payable in like manner. It thus appears that her first payment was one month late and less than half of what it should have been at the time it was made, and the next one was about half the proper amount without making up the deficiency. She also testified to later receipts which were at no greater rate. These facts show that in January, 1924, payments were not being made as represented, and from them an inference is possible that these contracts were not earning as much as was represented. We do not think, however, that this inference as to earnings was so conclusive as to preclude the court from granting a new trial on this point, for a deficiency in payments might be accounted for on other grounds than a deficiency in earnings, and no further showing on the latter point was before the court. The burden was upon the People to show the falsity of the representation as to earnings, and we cannot say that there was proof beyond a reasonable doubt.

Moreover, the inference from this testimony of Mrs. Stephens cuts two ways. The first two payments under her previous contracts, which amounted to less than fifty per cent of what they should have been, according to the representations testified to by her, were made before she entered into the contract and paid the money which form the subject matter of the ninth count. The trial court may have concluded from this fact that she had information before entering into the last-mentioned contract of the falsity of the representations, which were made to her in regard to earnings and payments, and hence that her reliance upon these representations was not established beyond a reasonable doubt. ▇ Such a conclusion would have required the granting of a new trial, and we cannot say that it was not warranted by the evidence.

At the request of the People the court instructed the jury as follows: "'You are instructed that directors of a corporation cannot lawfully make dividends except from the surplus profits arising from the business of the corporation. In other words, the law forbids a corporation to use any part of its capital stock to pay dividends. By capital stock is here meant 'the actual property of the corporation con-

tributed by the shareholders of the corporation,' that is, the money or other property which they pay or give for the shares of stock of the corporation."

No doubt the reason for giving this instruction was that several counts of the indictment set up certain transactions by which, as charged, the respondent sold preferred stock of Interstate Oil Corporation, and obtained money therefor by false representations as to the dividends which that stock was then earning. For the present purpose we assume that as to such a transaction the instruction was correct. But the indictment also refers to the earnings of the contract covered by the ninth count as "dividends," and charges the respondent with a false representation as to the "dividends," which such "units and interests" were then earning and paying. ■ The term "dividends" is not limited in its significance to the earnings of corporation stock, but is one of quite general meaning. "Both in common and legal parlance the term implies a portion of a fund divided among several others. . . . The term carries with it the idea of a division of a fund owned by several parties, and the dividend is the aliquot portion of the estate of the common owners." (18 Corpus Juris, 1406; *In re Fielding*, 96 Fed. 801.) As thus defined the term could be applied to the payments made as a result of dividing the income of the oil refinery among the persons investing in such contracts as were made with Mrs. Stephens, of which the evidence showed that several were outstanding. In view of the meaning of the term "dividend" and its use in the indictment to designate the payments to be made under the contract here involved, we think the jury must have understood from the foregoing instruction that the Brown Process Company could not pay to Mrs. Stephens the sums called for by that contract, except from its surplus profits; and it may have been by applying such a rule to the above mentioned evidence as to its financial condition that they concluded that the representations as to the earnings of the contract were false. As we have already stated, this is an erroneous view of the nature and effect of the contract, and the instruction referred to should not have been given without some qualification limiting its application to the payment of dividends on corporate stock. On a new trial

it should be omitted altogether, the other counts being disposed of by the acquittal.

The order appealed from is affirmed.

Conrey, J., and Houser, J., concurred.