[Crim. No. 424. Fourth Appellate District.—December 22, 1937.]

THE PEOPLE, Respondent, v. RUSSELL O. JACKSON et al., Appellants.

Hervey & Holt for Appellants.

U. S. Webb, Attorney-General, Frank Richards, Deputy Attorney-General, Thomas Whelan, District Attorney, Frank T. Dunn, Assistant District Attorney, and Victor C. Winnek, Deputy District Attorney, for Respondent.

JENNINGS, J.—The defendants have appealed from the judgments pronounced against them following their conviction of several offenses alleged to have been committed by them by an indictment which contained 15 separate counts. The first count of the accusatory pleading charged the defendants with having conspired to violate the provisions of section 6 of the Corporate Securities Act of California in the manner described in said count. The next eight counts alleged specific violations by the defendants of section 6 of the above-mentioned statute. Counts 10, 12, and 14 separately charged that the defendants on designated dates had conspired to obtain certain described property of named individuals by false promises with the fraudulent intent not to perform such promises. Each of the remaining counts, to wit: counts 11, 13, and 15 charged the defendants with the crime of grand theft. Upon the conclusion of the trial the jury returned separate verdicts finding defendants guilty of all the offenses of which they were accused except the offense of conspiracy alleged in count 14. Defendants thereafter presented a motion for a new trial which was granted as to the offenses alleged in counts 2, 7, 8, and 9 and denied as to the offenses alleged in the remaining ten counts. A motion in arrest of judgment was likewise denied as to the remaining ten counts. The appeal here perfected is taken not only from the judgments pronounced as aforesaid, but also from the court's order denying a new trial and from the order denying the motion in arrest of judgment. ■ With respect to the purported appeal from the last-mentioned order it is settled that an order denying a motion in arrest of judgment is not an appealable order. Any error committed by the trial court in denying such a motion is reviewable on an appeal from the judgment. (*People* v. *Williams*, 184 Cal.

590 [194 Pac. 1019] ; *People* v. *Rubens,* 11 Cal. App. (2d) 576 [54 Pac. (2d) 98, 1107].)

The first contention advanced by appellants which will here be considered is the contention that the trial court committed prejudicial error in advising the jury to return verdicts in favor of respondent on the pleas of former jeopardy and prior acquittal which the record indicates were entered by appellants to the accusation contained in each count of the indictment. The transcript shows that no evidence was produced during the trial in support of these pleas. It also appears, however, that before a jury was selected to try the cause appellants moved the court for a separate trial of the issues tendered by the special pleas which motion was denied and appellants thereupon objected to proceeding with the trial until the issues raised by such pleas had been determined, which objection was overruled.

Appellants concede that there is authority in this state which supports the action taken by the trial court in this case, i. e., submitting the issues raised by the special pleas to the same jury at the same time the issues presented by pleas of not guilty were submitted. That the concession thus made is proper and further, that when such pleas have been entered and no evidence supporting them is produced, it is incumbent upon the trial court to instruct the jury to find for the prosecution on the issues raised by the special pleas is apparent from the decision in *People* v. *Newell,* 192 Cal. 659 [221 Pac. 622].

Appellants nevertheless insist that the peculiar circumstances of this case are such that it was error for the trial court to proceed to trial on the issues presented by their pleas of not guilty in the face of their demand for a separate trial of the special pleas and of their objection to going to trial until the issues raised by their special pleas had been determined. The circumstances which appellants contend are proper to make the instant case an exception to the general rule announced in *People* v. *Newell, supra,* are fully set forth in *Jackson* v. *Superior Court,* 10 Cal. (2d) 350 [74 Pac. (2d) 243]. In passing it should be noted that the offenses here charged against appellants are different offenses than those alleged in the case last cited and that the decision therein is for this reason not applicable to the present situation. In our opinion, the circumstances upon which ap-

pellants rely are not sufficient to create an exception to the general rule heretofore stated. We know of no rule requiring the trial of issues raised by the special pleas in advance of the regular trial. The course of the proceedings was confined to the discretion of the trial court and no abuse of such discretion is manifest from a refusal to grant a separate trial on the special pleas.

A second contention which merits brief consideration relates to the sufficiency of the indictment. Appellants complain that the pleading whereby they were charged with the commission of the above-mentioned offenses is fatally defective. They particularly challenge the sufficiency of the first count wherein an attempt was made to accuse them of having conspired to violate the provisions of section 6 of the Corporate Securities Act. It may be remarked in passing that a demurrer which was interposed to the indictment was overruled. The language of the first count which is subjected to special criticism is as follows: ''As a part of said conspiracy, it was agreed by and between said Russell O. Jackson and Frank A. Scott, acting as officers of the said Fidelity Sales & Holding Corporation, would purchase for and on behalf of said Russell O. Jackson and Frank A. Scott, certain securities.'' It is urged that this language is ambiguous, uncertain, and unintelligible. That the quoted sentence is not a model of proper grammatical construction may readily be conceded. That it is so uncertain and unintelligible as to demand reversal of that part of the judgment which relates to the first count of the indictment is not apparent. Review of the record herein shows that not only was it made abundantly clear to appellants as the trial progressed that what was charged against them by the criticised verbiage was that as officers of the corporation they would cause the corporation to purchase for them certain securities but close inspection of the involved allegations contained in the first count indicates that the language to which appellants except was clarified and its ambiguity and uncertainty cured by subsequent allegations. We think, therefore, that appellants' denunciation of the language at this stage of the proceeding is not justified and that the apparent incorrectness of grammatical construction of the quoted language does not warrant the penalty of reversal which is demanded.

■ A third contention of appellants relates to the offenses alleged in counts 1, 3, 4, 5 and 6, of which they now stand convicted, and deserves serious consideration. The last-mentioned counts in effect charge that appellants caused the corporation of which they were officers to deal in designated securities when, as they well knew, said corporation had no broker's license permitting it so to deal. The securities in which it is alleged the corporation thus dealt are described in the indictment as certificates of interest in oil titles. The record shows that as a necessary part of its case in attempting to prove the commission by appellants of the offenses alleged in the above-mentioned five counts, the prosecution introduced in evidence a number of written instruments, some of which were executed either in the state of Texas or Oklahoma and others in California. Each of the instruments thus produced is entitled ''Mineral Deed''. One of the deeds thus entitled which was executed by the Fidelity Sales & Holding Corporation in the county of San Diego on May 20, 1935, will serve to illustrate the contention of appellants which is now being considered. This deed purported to convey to the American Fidelity Corporation, Ltd., an undivided one-half interest in and to all of the oil, gas, and other minerals in and under and that might be produced from certain described lands in the state of Oklahoma ''together with the right of ingress and egress at all times for the purpose of mining, drilling, exploring, operating, and developing said lands for oil, gas, and other minerals and storing, handling, transporting, and marketing the same therefrom with the right to remove from said land all of Grantee's property and improvements. This sale is made subject to any rights now existing to any lessee or assigns under any valid and subsisting oil and gas lease of record heretofore executed; it being understood and agreed that said Grantee shall have, receive and enjoy the herein granted undivided interest in and to all bonuses, rents, royalties and other benefits which may accrue under the terms of said lease in so far as it covers the above-described land from and after the date hereof, precisely as if the Grantee herein had been at the date of the making of said lease the owner of a similar undivided interest in and to the lands described and Grantee one of the lessors therein.'' The *habendum* clause of the instrument is the usual clause which appears in deeds conveying a fee title to land.

It is the contention of appellants that the various instruments introduced in evidence as aforesaid were deeds whereby interests in real property were transferred, that they do not come within the definition of "Securities" as this term is defined in the California Corporate Securities Act and that appellants could not therefore be successfully prosecuted therefor as charged in the indictment.

The word "security" is defined in section 2, subd. 7 of the Corporate Securities Act as amended (Stats. 1933, p. 2308). The only portion thereof which is relied upon by respondent as .indicating that the mineral deeds produced in evidence come within the definition there given is the following: "Certificate of interest in an oil, gas, or mining title or lease." It is respondent's contention that the instruments, although in form deeds conveying interests in land, are in reality certificates of interest in oil titles.

In the face of the conflicting contentions thus advanced a statement of the factual background surrounding the execution of the deeds as this history was developed by the evidence produced during the trial may be of assistance. In attempting to reproduce the picture it will be provisionally assumed that the trial court made correct rulings with respect to the admission and rejection of evidence although in fairness to appellants it should be stated that certain rulings of the court relating thereto are questioned by them.

Two corporations occupy prominent positions in the story. They are the American Fidelity Corporation, Ltd., and the Fidelity Sales & Holding Corporation. The former was incorporated on August 29, 1932, and the latter on February 27, 1933. In February, 1935, the total number of shares of stock of the first-mentioned corporation which had been issued was 167. Of the stock thus issued the stock certificate book of the corporation showed that Russell O. Jackson held 85 shares, J. O. Hayes 80 shares, F. A. Scott one share and John K. Jackson one share. R. O. Jackson was the president and F. A. Scott the vice-president of this corporation. No stock was ever issued in the Fidelity Sales & Holding Corporation. R. O. Jackson was the president and F. A. Scott the vice-president of this corporation. The same suite of offices was used by both corporations. During the years 1934 and 1935 an extensive campaign of newspaper and radio advertising was carried on by the American Fidelity Cor-

poration, Ltd., for the purpose of interesting the public in what was denominated its ''Regular Monthly Income Plan''. Thereby a large number of persons became interested in the proposal and considerable quantities of various types of securities were transferred to the corporation in exchange for the hereinabove described mineral deeds. That the volume of business thus carried on by this corporation was large and the profits resulting therefrom not inconsiderable, particularly to appellant Jackson, is apparent from the fact that at all times material to the present inquiry he, as president of the corporation, received a salary of $1,000 per month. He also received a cash dividend of $100 per share declared on December 14, 1935, and a cash dividend of $800 per share declared on February 1, 1936. Not only by means of the radio and newspaper advertising was the monthly income feature stressed but also to numerous prospective investors who called at the office of the company it was consistently emphasized that an exchange of stocks, bonds, and other property owned by them for the oil royalty deeds which the corporation had for sale would result in the payment to such persons of a definite monthly sum throughout the remainder of their lives and to their heirs after they should have passed from the sphere of mortal existence.

The manner by which these allegedly valuable interests in oil royalties were acquired by the American Fidelity Corporation, Ltd., and were passed on to those persons who surrendered their stocks and bonds in various well-known and long-established corporations and companies deserves mention. Some person in Texas or Oklahoma, usually J. O. Hayes, would execute a mineral deed in the form heretofore described conveying a designated interest in oil, gas, or other minerals which might thereafter be produced from land described in the deed to the Fidelity Sales & Holding Corporation. Thereafter this corporation would execute a similar deed conveying the oil royalty interest to the American Fidelity Corporation, Ltd. The last-mentioned corporation would then by like mineral deeds convey to its customers fractional parts of the interest which it had obtained from the Fidelity Sales & Holding Corporation. At first blush the interposition of the Fidelity Sales & Holding Corporation in the scheme would appear to be cumbersome and useless. However, when the entire history of a transaction of this character was ex-

posed the reason for the presence therein of the holding corporation became clear. The purchase and sale of one such interest may be noted for the purpose of illustrating the plan of operation. This particular interest was denominated 450 units Wilcox-Buxton Lease. The evidence showed that it was purchased by the Fidelity Sales & Holding Corporation from J. O. Hayes on May 10, 1935, for a consideration of $19,000 and sold on the same day to the American Fidelity Corporation, Ltd., for the sum of $23,625 and thereafter sold by the last-mentioned corporation to the public for $45,000. The gross profit accruing therefrom to the American Fidelity Corporation, Ltd., was therefore $21,375. However, the Fidelity Sales & Holding Corporation also derived a gross profit of $4,625 from the transaction so that the combined gross profit obtained by the two corporations was $26,000. It is apparent, therefore, that the Fidelity Sales & Holding Corporation was utilized in the scheme of operations as a convenient device for enlarging the spread of profit which would finally accrue to both corporations when the various interests were parceled out and sold to the public. In this connection it should be observed that the evidence indicated that the funds required for the purchases of such interests by the Fidelity Sales & Holding Corporation were uniformly furnished by the American Fidelity Corporation, Ltd. It should further be observed that the last-mentioned company held a broker's license issued by the state corporation department, whereas the holding corporation had no such license. In conformity with the regulations of the state corporation department reports of purchases and sales made by the American Fidelity Corporation, Ltd., were regularly submitted by this corporation to the state corporation department. In these reports the purchase price was consistently stated to be the price which the American Fidelity Corporation, Ltd., had paid the holding corporation, no mention being made of the price originally paid by the holding corporation when it acquired such interests.

Having in mind the above-stated history of the transactions whereby the various interests were acquired and sold, we may proceed to a consideration of appellants' contention that these property rights or interests were interests in real property and therefore not securities and that the Fidelity Sales & Holding Corporation was not required by law to have a broker's license

in order to deal in such interests and that consequently the conviction of appellants of the offenses alleged in counts 1, 3, 4, 5 and 6 was improper and the judgment, so far as it relates to said counts, must be reversed.

It is admitted by both parties to this appeal that there is no California authority which bears directly upon the problem thus presented and that the question is a novel one in this state. It must, we think, be conceded that the various instruments entitled ''Mineral Deeds'' are in form deeds and that they purport to convey interests in real property. It must further be conceded that the term ''Securities'' in its ordinary meaning does not cover deeds to real property. However, as heretofore observed, the Corporate Securities Act of this state in section 2, subd. 7 thereof states that a certificate of interest in an oil, gas, or mining title or lease is a ''security'' for the purposes of the act. We find no unusual difficulty in arriving at the conclusion that the instruments under consideration, although they are in form deeds, in reality amount to certificates of interest in an oil or mining title and that they therefore come within the definition of securities, as stated in the statute. The deeds themselves show that what was intended to be conveyed thereby consisted of fractional interests in oil which might be produced from certain described land. No attempt was made to convey any other interest in the land. Undoubtedly, an owner of land may by suitable conveyance divest himself of his entire interest or a part thereof in whatever minerals may rest beneath the surface of the earth. There is nothing incomprehensible about dividing land horizontally as well as vertically. We suppose that the right or ownership of the landowner in the oil which is either known or suspected to be under the surface of the ground may be properly called an oil title just as we use the expression ''land title'' to signify ownership of the surface which is the commonly accepted meaning of the expression ''land title'' or ''title in land''. Another obstacle, however, presents itself in the process of reasoning whereby the conclusion is reached that the instruments under consideration come within the proper purview of the Corporate Securities Act. This difficulty occurs by reason of the use of the word ''certificates''. Admittedly, the instruments in question have the appearance and legal phraseology of deeds. There is nothing in them which indicates

that they possess the character of mere certificates. No language is contained within them which is usually found in those instruments which are legally denominated ''certificates''. Nevertheless, although the instruments are undoubtedly deeds in form and by their terms convey more extensive rights than certificates, we are constrained to the opinion that they come within the scope of the statute.

In arriving at this conclusion we find material assistance in looking through the mere form of the instruments to the facts and circumstances which surrounded their execution. It should be and is an established principle of the law that the substance and not the mere form of transactions constitutes the proper test for determining their real character. If this were not true it would be comparatively simple to circumvent by sham the provisions of statutes framed for the protection of the public. This the law does not permit. (*People* v. *Ratliff*, 131 Cal. App. 763, 772 [22 Pac. (2d) 245]; *People* v. *Reese*, 136 Cal. App. 657, 672 [29 Pac. (2d) 450].)

The evidence showed the true character of the business in which appellants were engaged and in whose accomplishment the so-called ''mineral deeds'' were executed. Through the media of newspaper advertisements and radio programs and by oral representations the desirability of providing a definite monthly income for life was emphasized. By the same means the decrease in value of well-known securities and the failure of such securities to pay dividends, facts which at the time were only too familiar to the public, were continuously stressed and the ability of the American Fidelity Corporation, Ltd., to take over such securities and assure the owners relief from pecuniary worries and financial independence through payment to them of definite and satisfactory monthly income was persistently advertised. Such conduct is that which is generally practiced by those who are engaged in the business of selling stocks and bonds, familiar types of ''securities'', to the public. Furthermore, the evidence showed that in each and every instance the grantee in one of the mineral deeds executed by the American Fidelity Corporation, Ltd., did for a time receive at least the amount per month which had been promised. The peculiar and rapid decrease in such monthly payments need not here be mentioned since the pecuniary value of whatever the purchasers received is not a factor necessary to be considered in arriving

at a determination of the real character of the instruments.

There is, however, another feature which deserves mention. This feature is the splitting up of the various interests which the American Fidelity Corporation, Ltd., had acquired into numerous fractional parts. We note, for example, that in one of the mineral deeds executed by the corporation to a purchaser the interest transferred was "an undivided 20/1280th". In a third it was a "10/1200th". In a fourth it was a "15/1280th". In a fifth instance it was described as "an undivided 2.100/216 interest". These fractions are exceedingly small and when this feature is taken into consideration along with the emphasis placed upon the factor of monthly income it is apparent that the instruments, whereby such infinitesimal interests were transferred were neither issued nor received as deeds but that in fact they were nothing more than certificates of very small interests in oil titles. It should be noted that each of such deeds gave to the grantee the "right of ingress and egress at all times for the purpose of mining, drilling, exploring, operating and developing said lands for oil, gas, and other minerals". Bearing in mind, however, that all the grantees named in such deeds were residents of San Diego County, whereas the lands were located in Oklahoma and Texas, and observing also the very small fractional interests conveyed, we have no hesitancy in declaring that the quoted language consists of empty words and that it was never anticipated that the grantees would ever avail themselves of the right so generously accorded to them.

As heretofore stated, there is a dearth of authorities in this state bearing on the question now under consideration. There are, however, two California decisions which, though not precisely in point, are of material assistance to the solution of the problem. The first of these is Domestic & Foreign Petroleum Co., Ltd., v. Long, reported in 4 Cal. (2d) at page 547 [51 Pac. (2d) 73]. In this case lessees under an oil and gas lease made assignments of percentages of oil and other substances to be produced during the lease and money to be derived from the sale thereof. Apparently the instruments of assignment were entitled "grant deeds" and used the words "grant" and "convey", terms manifestly appropriate to deeds rather than to certificates of interest. It was contended by the defendants in the action that the

194

instruments were not securities as this term is defined in the Corporate Securities Act. This contention did not prevail and it was held that the instruments were securities. It should be observed that the assignments expressly provided that the grantors or such persons as they might designate should be the only persons authorized to drill for or produce oil and that the grantees should "not have any voice concerning said operations". In this regard the instruments analyzed in the cited decision differ from those which are the subject of inquiry in the present proceeding. Nevertheless, as heretofore pointed out, when due consideration is here given to the circumstance that the interests granted by the "mineral deeds" in the instant action were very small fractional interests in oil and gas to be produced from land located in Texas and Oklahoma and that such deeds were sold to California residents, no insurmountable difficulty is encountered in arriving at the conclusion that the grant of a right of ingress to and egress from the land "for the purpose of mining, drilling, exploring, operating, and developing said lands for oil, gas, and other minerals, etc." was not in fact a substantial right but rather that it was a purely formal right never expected to be utilized and therefore a most immaterial, wholly unimportant provision which we are at liberty to disregard in attempting to discover the true character of the instruments. Being persuaded to the view that the grant of a right to drill and develop the land described in the so-called "mineral deeds" was, under the circumstances, purely formal and manifestly illusory we find most pertinent to the present problem the following quotation from page 555 of the cited case: "Instruments such as those in the Craven case (*People* v. *Craven,* 219 Cal. 522 [27 Pac. (2d) 906]) and the instant case are not issued to persons who expect to reap a profit from their own services and efforts exerted in the management and operation of oil-bearing property, but to those in the category of investors, who, for a consideration paid, stipulate for a right to share in the profits or proceeds of a business enterprise or venture to be conducted by others." The second decision to which we refer is *People* v. *Rubens,* 11 Cal. App. (2d) 576 [54 Pac. (2d) 98, 100, 1107]. In this latter case the defendant owned an oil lease on land located in Sacramento County, California. By the terms of the lease he was authorized to prospect for,

sink wells and produce oil and gas from the land. He thereupon proceeded to sell interests in the enterprise under the fictitious name of Capitol Lease Development Company and operated the oil development business in the name of a corporation having 25,000 shares, of which he was the president and manager and owned all but two shares of the issued stock. Each of the instruments whereby the interests were conveyed was entitled an ''Option to Purchase Oil and Gas Lease Assignment'' and purported to give to the vendee named therein an ''option to purchase oil and gas lease assignments of [an undivided] five sixty-fourths (5/64) of an acre'' of the entire tract of land but failed to describe the allotted portion thereof. Another term of the instrument provided that within 30 days from the ''bringing in'' of the first well on the entire tract of land the purchaser should pay an additional designated sum of money which would entitle such vendee to a community lease for his proportionate interest in the entire project. A certain proposed drilling program to be effectuated by the above-mentioned corporation was set out in the instrument which further stipulated that the corporation would, upon completion of the contracts to purchase the interests, execute to each of the purchasers a community lease for his proportionate interest in the entire project on a designated participating basis. Attached to each of such instruments was the detailed form for the proposed community lease which amounted to a contract making each purchaser a *pro rata* shareholder in the oil producing enterprise to be conducted on the entire tract of land. The defendant was charged with issuing and selling certificates of interests in an oil and gas lease without having secured a permit therefor in violation of the Corporate Securities Act. After conviction upon this and other charges contained in the indictment under which he was prosecuted he appealed from the judgments of conviction. One of the principal questions presented on the appeal was whether or not the above-described instruments were securities as this term is defined in the Corporate Securities Act. The reviewing court, although it concluded that each unit or share sold by the defendant represented a five sixty-fourths undivided portion of an acre of land, nevertheless found that the instruments in which the defendant was shown to have been dealing were in fact securities as that term is defined in the Corporate Securities Act.

In addition to the above-cited California authorities our attention has been particularly directed to a very recent decision of the Supreme Court of Rhode Island which presents a striking factual similarity to that which appears in the instant proceeding. The decision to which reference is thus made is *State* v. *Pullen,* decided on June 14, 1937, and reported in 192 Atl. at page 473. In this case the state of Rhode Island brought an action to restrain the sale of securities by the defendant, because of his failure to register with the division of banking and insurance, as a broker or salesman of securities. The trial court found in plaintiff's favor and on appeal by the defendant the judgment was affirmed. The securities in which the defendant was dealing were called oil royalties founded upon a lease agreement whereby the owner of lands in Texas leased the same to an oil company for the sole purpose of mining and operating for oil and gas. The lease contained a covenant expressly permitting assignment of the respective estates of the lessor and lessee but it was provided that before such assignment should bind the lessee a written transfer of the assignment was required to be furnished to the lessee. In accordance with this provision the lessor proceeded to sell to purchasers fractional shares of his rights to receive oil royalties and to effectuate the same executed instruments which were entitled "Mineral Deeds". These instruments were substantially similar to the mineral deeds now being considered on the present appeal and constituted the written evidence of the rights which the defendant in the cited case desired to sell in Rhode Island. The Rhode Island statute defined the term "security" as follows: "The term 'security' or 'securities' shall mean and include the currency of any government other than the United States, in whatever form the same may be dealt in, any bond, stock, treasury stock, note, debenture, certificate of interest in a profit sharing agreement, certificate of interest in an oil, gas or mining lease, evidence of indebtedness, or any form of commercial paper, transferable certificates of interest or participation, or transferable shares, or similar evidences of beneficial interest issued by any person as defined in subdivision (b) of this section."

It was contended in the cited case, just as is here contended, that the mineral deeds constituted written evidence of interests in realty and that they did not come within the

meaning of the above-quoted language of the statute. In disposing of this contention the Rhode Island court declared that the technical nature of the instruments was inconsequential in view of the purpose and design of the statute regulating the sale of securities. The court therefore proceeded to look through the legal form of the documents and announced that in reality they amounted to investment contracts which were peculiarly adapted to perpetuation of the evil which the statute was designed to eradicate. It was held therefore that the instruments, although deeds in form technically representing evidence of interests in real property, primarily constituted evidence of shares in oil produced under an oil lease and that they came within the meaning of the statutory definition of ''securities''.

It is proper to observe that, in so deciding, the court was careful to point out that the proceeding which it was considering was equitable in character, that it was not a criminal action for enforcement of the penalties provided by the act and that strict construction of the statute was not therefore required.

In this respect the cited case is essentially different from the instant action. We are nevertheless constrained to the view that the reasoning of the Rhode Island Supreme Court is applicable to the problem which is here presented. The instruments which we have here are essentially similar in form to those that were considered in the cited case. The purpose of our statute is the same purpose which the Rhode Island court declared was the purpose of the statute of that state. (*People* v. *Craven*, 219 Cal. 522 [27 Pac. (2d) 906].) In *People* v. *White*, 124 Cal. App. 548 [12 Pac. (2d) 1078], the defendant had been convicted of the offenses of selling securities without having secured a permit from the commissioner of corporations and of grand theft. On appeal one of the legal principles which he relied upon in support of his contention that the instruments in which the evidence showed he had dealt were not ''securities'' as defined by our statute was the familiar rule requiring strict construction of penal laws. In disposing of the contention thus presented the appellate court used the following language at page 555 of the cited volume: ''Appellant here contends that it is the rule that criminal statutes are subject to the rule of strict construction, and that under a strict construction the contracts

in question do not come within the provisions of the Corporate Securities Act. Whatever may be the rule elsewhere, in this state the common-law rule that penal statutes are to be strictly construed has no application, and statutes of this state are to be construed according to the fair import of their terms and with a view to effect the object of the statute as well as to promote justice. (Pen. Code, sec. 4; Pol. Code, sec. 4; Civ. Code, sec. 4.)'' We think therefore that, having in mind the purpose of the Corporate Securities Act, we are not compelled to construe the statute in compliance with the common-law rule of strict construction but that we should rather indulge in a construction of the act in accordance with the fair import of its terms.

A fourth contention of appellants relates to the admission of certain evidence. During the trial witnesses produced by respondent were allowed to testify as to observations which they had made of the books of the two corporations hereinabove mentioned and excerpts from the books were received in evidence. In each instance where such evidence was admitted appellants interposed timely objection the chief basis of which was that it was improper to admit secondary evidence of the contents of the books in the absence of proof that the books themselves were lost or had been destroyed. It must, however, be noted that possession of the corporate books was traced to appellants themselves or to the counsel who represented them and inquiry by the court as to whether or not counsel had the books in their possession at the time of trial brought a negative response.

Examination of the record impels the conclusion that the trial court ruled correctly in admitting the evidence. The extracts taken by the auditors from the books of the two corporations formed a necessary and logical part of respondent's case. There was satisfactory proof that the books had last been seen in the possession of appellants or their counsel. Certainly the court could not compel appellants to produce any incriminating writing. (*People* v. *Chapman*, 55 Cal. App. 192 [203 Pac. 126].) Counsel for appellants in whose office the evidence indicated the books had last been seen categorically denied in reply to the court's inquiry that they had possession of the books. It is apparent that for all practical purposes the original documents which formed a necessary part of respondent's case were as effectually lost as

though their actual loss or destruction had been conclusively established. Under these circumstances no error was committed in the reception of secondary evidence of the contents of the books. (Code Civ. Proc., sec. 1855; *People* v. *Powell,* 71 Cal. App. 500, 513 [236 Pac. 311].)

 A fifth contention advanced by appellants relates to their conviction of the offenses charged in the third, fourth, fifth, and sixth counts of the indictment. As heretofore noted, it was alleged in these counts that appellants, acting as officers of the Fidelity Sales & Holding Corporation, had committed specific violations of section 6 of the Corporate Securities Act by causing the corporation on designated dates, to act as a broker in selling the hereinabove described mineral deeds. It is urged that, at most, the evidence which was produced by respondent to establish the commission of the offenses thus alleged was insufficient to support Jackson's conviction of any more than two thereof, and likewise insufficient to support Scott's conviction of more than two of the offenses. The basis for this contention exists in the four mineral deeds which were relied upon by respondent as the final link in the chain of evidence whereby the prosecution sought to prove the commission of the four specific offenses charged in the above-mentioned counts of the indictment. Two of these deeds were executed by appellant Jackson alone as president of the Fidelity Sales & Holding Corporation and two by appellant Scott alone as vice-president of the corporation. From this fact it is declared that there was no showing that Scott participated in or had any knowledge of the execution by Jackson of the two deeds which bore Jackson's name alone and likewise that there was an entire lack of evidence to connect Jackson with the execution of the two deeds to which Scott's signature was appended.

The contention thus presented is devoid of merit. It fails to take into consideration the numerous circumstances which surrounded the business in which appellants were shown to have been engaged as these circumstances were developed by the evidence. Examination of the record impels the conclusion that the evidence submitted by respondent was ample to justify the jury in drawing the inference that each of the appellants was fully cognizant of the execution of deeds in the name of the corporation by the other. Evidence which was not contradicted showed that Jackson was president and

Scott vice-president of this corporation in which no stock was ever issued. That these two individuals completely controlled and dominated the corporation is plain and that it was used by them as a convenient auxiliary to the American Fidelity Corporation, Ltd., of which appellants were likewise the principal officers in the business of dealing in oil royalties is also clear. That the Fidelity Sales & Holding Corporation was created and used by appellants for the purpose of increasing the amount of profit derived by the American Fidelity Corporation, Ltd., from the sale of royalties is not open to doubt. That the former corporation was purely a dummy manipulated and used by appellants in the business of dealing in oil royalties is apparent. These circumstances and others that might be mentioned render it inconceivable that either of the appellants who were shown to have been so closely associated in the business of dealing in oil royalties could have been ignorant and uninformed as to the execution of the mineral deeds by the other as an officer of the corporate dummy which they jointly controlled.

The remaining contentions developed by appellants on this appeal relate to their conviction of the offenses charged in counts 10, 11, 12, 13 and 15. As heretofore noted, these offenses were conspiracy to obtain property by false promises with the fraudulent intent not to perform such promises and grand theft. Counts 10 and 12 alleged the commission by appellants of the crime of conspiracy and the remaining three counts charged the offense of grand theft.

With respect to their conviction of the crime of conspiracy as charged in counts 10 and 12 appellants complain that the evidence produced by respondent to prove the charge was insufficient to justify the jury's verdict of guilt. It is pointed out that section 182 of the Penal Code defines ''Criminal Conspiracy'' and that subdivision 4 of the section makes it a crime for two or more persons to conspire to obtain money or property by false promises with fraudulent intent not to perform such promises. It is strenuously urged that all the evidence bearing upon this particular charge of conspiracy which was submitted showed that the statements which were relied upon as constituting promises were mere statements of opinion and were not and could not from their nature be regarded as promises. Without attempting to restate the voluminous evidence relating to the

representations which appellants made in their endeavors to persuade their patrons to surrender property which they owned in return for the so-called oil royalties it may be said that the effect of all such representations was that the prospective purchasers would receive from the royalties a stated monthly income for at least as long as they should live. Appellants maintain that the representations thus made did not and could not amount to promises but that they were obviously no more than mere predictions that the oil royalties would yield certain returns and that, bearing in mind the peculiar character of the investments, it is clear that the statements attributed to them were mere expressions of opinion. In this connection it is pointed out that it is recognized that no one can definitely know the exact quantity of oil which exists beneath the surface of the earth even in a proven oil field. It is further declared that the testimony of respondent's witnesses regarding this feature showed that they understood that appellants were not guaranteeing that the royalties would yield the various returns stated and even if they did have a different understanding they must have realized from the very nature of the investments which they were making the obvious impossibility of any such guaranty.

Again it must be remarked that we may not overlook the circumstantial background against which the various specific sales of oil royalties made by appellants were projected. The obvious credulity of appellants' victims is too plain to be disregarded. The very emphasis placed upon the repeated representation that the investment of comparatively small amounts of money would yield not probably or possibly but certainly, and not approximately but surely, specified, definite returns each month for as long a time as the investors should remain alive is an outstanding circumstance to which we may not close our eyes. Under the circumstances which surrounded the sales of oil royalties we are not prepared to say that the jury could not reasonably have inferred that the representations in fact amounted to promises that appellants would turn over to their customers oil royalties in sufficient quantity to yield the monthly returns which were so persistently emphasized. True enough, in each instance the exact quantity of the fractional interest was plainly stated in the various mineral deeds. Nevertheless, having in mind the certainty and definiteness of fixed, undiminishing monthly

payments continuously and constantly stressed by appellants, we may not in fairness declare that the credulous victims of appellants could not have understood that the representations meant that sufficient quantities of oil royalties would be provided to yield the promised returns. If such was the situation, and inspection of the record impels the conclusion that the jury may well have inferred that it was from the mass of evidence bearing upon the matter that was placed before it, then no difficulty is encountered in determining that false promises were in fact deliberately made by appellants with the positive intent not to perform them.

 Appellants further complain of their conviction of the crime of grand theft as charged in the 11th, 13th, and 15th counts of the indictment. The contention advanced with respect to these charges is likewise insufficiency of the evidence to support the jury's verdict. It is again urged that the representations which were shown to have been made by them related exclusively to the future and hence could amount to nothing more than mere predictions or expressions of opinion. It must be conceded that all of the evidence which was produced in support of the grand theft charges showed that the representations made by appellants related to the future. Again, without attempting to state in detail the various representations upon which respondent relied to establish the necessary element of false pretenses it is proper to say that each and all of the representations were in effect that the persons to whom they were made would, if they should purchase the oil royalties, derive definite returns therefrom payable monthly.

Before attempting an analysis of the representations thus shown to have been made certain general observations are in order. In the first place, it is apparent that the offenses of grand theft of which appellants were accused consisted of the fraudulent acquisition by appellants of certain described personal property of others by means of false representations or pretenses. We do not understand that there is any contention to the contrary by the respondent. In the second place, it is clear that the conviction of appellants of the charges of grand theft may not be sustained on the ground that the representations amounted to false promises. In this respect there is a marked distinction between the charges of conspiracy contained in the 10th and 12th counts of the

indictment and the charges of grand theft contained in the 11th, 13th, and 15th counts. In those counts which alleged the commission of conspiracy it was fully and carefully alleged that the conspiracy which appellants had committed was a conspiracy to obtain property by false promises with fraudulent intent of nonperformance. The accusation thus made was drawn under section 182 of the Penal Code wherein the crime of "criminal conspiracy" is defined and follows the exact language of subdivision 5 of said section. The accusation of grand theft was drawn in accordance with the provisions of section 484 of the Penal Code wherein the crime of theft is defined. The last-mentioned statute makes no reference to promises. The words therein contained which are important to the present discussion are "representation" and "pretense". It is necessary, therefore, to approach the matter now under consideration with a distinct realization that promises, however false and fraudulent they may be, cannot support a conviction of grand theft as defined in section 484 of the Penal Code.

The obvious distinction between the offenses of criminal conspiracy with whose commission appellants were accused and the charges of grand theft made against them provides a proper introduction to a familiar principle of criminal jurisprudence which, in our opinion, furnishes a key to the solution of the immediate problem now under consideration. The offense specified in each of the three counts of the indictment now being considered is what was formerly denominated the crime of obtaining money, property, or labor by false pretenses. This last-mentioned offense is still denounced by section 532 of the Penal Code. However, as has been heretofore pointed out, the effect of section 484 of the Penal Code as it now reads is merely to amalgamate the crimes of larceny, embezzlement, false pretenses, and kindred offenses under the cognomen of theft. (*People* v. *Myers,* 206 Cal. 480, 483 [275 Pac. 219] ; *People* v. *Bratton,* 125 Cal. App. 337, 341 [14 Pac. (2d) 125] ; *People* v. *Brock,* 21 Cal. App. (2d) 601 [70 Pac. (2d) 210].) There is no inconsistency between sections 484 and 532 of the Penal Code and the applicable provisions of the former have in effect repealed the identical provisions of the latter. (*People* v. *Carter,* 131 Cal. App. 177, 182 [21 Pac. (2d) 129].)

Since it is abundantly apparent that the only evidence submitted which tended to prove that appellants had committed the crime of grand theft indicated that they had obtained certain property by means of false representations it becomes necessary to measure these representations by the test of a familiar and well-settled legal principle peculiarly applicable to the offense of obtaining property by false pretenses or representations. This established principle is that the representations shown to have been made must relate either to an existing or to a past fact. (*People* v. *Wasservogel*, 77 Cal. 173 [19 Pac. 270] ; *People* v. *Walker*, 76 Cal. App. 192 [244 Pac. 94] ; *People* v. *Moore*, 82 Cal. App. 739 [256 Pac. 266] ; *People* v. *Robinson*, 107 Cal. App. 211 [290 Pac. 470] ; *People* v. *Reese*, 136 Cal. App. 657 [29 Pac. (2d) 450].) Representations which in reality amount to no more than mere predictions of events to occur in the future or which in fact consist of expressions of opinion do not satisfy the statutory requirements and a conviction obtained on the strength of such representations may not be sustained. (*People* v. *White*, 85 Cal. App. 241, 250 [259 Pac. 76].) The representations which it was shown appellants had made to the persons mentioned in the grand theft counts of the indictment were statements that looked to the future alone. They did not pretend to relate either to the present or to the past. Measured by the above-mentioned test it is manifest that the representations do not constitute a proper evidentiary basis for the conviction of grand theft which appellants suffered.

Respondent makes some effort to sustain the jury's verdict finding appellants guilty of the grand theft charges by arguing that appellants advertised and represented to the public that they had a certain well-conceived plan whereby they would assure to investors the payment of a definite monthly income for life whereas it appeared that in reality they had no such plan. It is, we believe, a sufficient answer to this contention to observe that the evidence which respondent produced which related directly to the persons named in the three grand theft counts of the indictment showed that to each of such persons appellants made oral representations the effect of which was as heretofore mentioned. Furthermore, it is not at all clear that respondent made satisfactory proof of the exposition to the public by

appellants of the so-called "monthly income plan". Respondent did produce what purported to be copies of portions of radio programs broadcast to the public which were marked for identification but apparently these documents were not received in evidence. In any event the essence of the "plan" as developed was that prospective investors, by turning over to appellants securities, the income from which had either suffered diminution or entirely ceased, might be assured of definite monthly income in the future. The basic idea of the plan was therefore an assurance of future income and is vulnerable to the same criticism as are the oral representations shown to have been made directly to the persons designated in the grand theft counts.

The final complaint presented by appellants relates to a number of instructions which they offered and which it is contended the trial court erroneously refused to give and to certain other instructions which were given by the court which it is claimed contained incorrect statements of legal principles. Examination of the entire body of the instructions given by the court impels the conclusion that the jury was fully, fairly and correctly advised thereby of the various legal principles applicable to the evidence and that no reversible error was committed in the refusal to give certain instructions prepared and offered by appellants.

For the reasons stated herein the attempted appeal from the order denying the motion of appellants in arrest of judgment is dismissed. Those portions of the judgments and of the order denying the motion of appellants for a new trial which relate to the crime of grand theft as alleged in counts 11, 13, and 15 of the indictment are reversed. The remainder of the judgments and order denying a new trial from which this appeal has been perfected are and each of them is affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 20, 1938.